RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

GREGORY THOMPSON,

        *Petitioner-Appellant,*

    *v.*

RICKY BELL, Warden,

        *Respondent-Appellee.*

Nos. 06-5744/5770

————————————

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga and Winchester.
Nos. 04-00177; 98-00006—R. Allan Edgar, District Judge.

Argued: October 30, 2008

Decided and Filed: September 11, 2009

Before: SUHRHEINRICH, MOORE and CLAY, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Dana Hansen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Jennifer Lynn Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Dana Hansen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Jennifer Lynn Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

     CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. SUHRHEINRICH, J. (pp. 27-41), delivered a separate opinion concurring in part and dissenting in part.

————————————

## OPINION

————————————

     CLAY, Circuit Judge. Petitioner Gregory Thompson ("Thompson") appeals the district court's dismissal of his habeas petition brought pursuant to 28 U.S.C. § 2254, in which he seeks relief from execution because of his alleged incompetency. Separately,

1

Thompson appeals the district court's denial of his motion pursuant to Federal Rule of Civil Procedure 60(b), in which he moves to re-open his original habeas petition challenging his conviction and sentence. For the reasons that follow, we **AFFIRM in part** and **REVERSE in part,** and **REMAND** to the district court for further proceedings.

## BACKGROUND

In 1985, a Coffee County Circuit Court jury in Tennessee found Thompson guilty of the first-degree murder of Brenda Lane, and following the sentencing phase of the trial, sentenced Thompson to death. *See State v. Thompson*, 768 S.W.2d 239 (Tenn. 1989). The Tennessee courts affirmed Thompson's conviction on direct and collateral review. In 1998, Thompson filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, and the district court denied the petition on February 17, 2000. On January 9, 2003, this Court affirmed the district court's dismissal of Thompson's petition. *Thompson v. Bell*, 315 F.3d 566, 571 (6th Cir. 2003). On December 1, 2003, the United States Supreme Court denied Thompson's certiorari petition, and on January 20, 2004, denied his petition for rehearing. *Bell v. Thompson*, 545 U.S. 794, 800 (2005).

## I.      Thompson's Incompetency Petition

On January 21, 2004, the day after the Supreme Court denied Thompson's petition for a rehearing, Tennessee's attorney general filed a motion with the Tennessee Supreme Court to set a date for Thompson's execution. On February 2, 2004, Thompson filed a response opposing the state's motion and a petition providing notice of his incompetency to be executed. On February 25, 2004, the Tennessee Supreme Court set an execution date of August 19, 2004, but remanded the issue of Thompson's competency to the trial court.

Under Tennessee law, set forth in *Van Tran v. State*, 6 S.W.3d 257, 266 (Tenn. 1999), a prisoner is not competent for execution if he "lacks the mental capacity to understand the fact of the impending execution and the reason for it." Under this standard, a prisoner seeking to be found incompetent for execution in Tennessee has the initial evidentiary burden to make a "threshold showing" that his present incompetency is genuinely at issue in order to warrant an evidentiary hearing. *Id.* at 268-69. In his petition to the trial court, Thompson requested an evidentiary hearing to determine his competency,

and submitted with his motion his prison medical records, along with the reports of three mental health experts–John S. Rabun ("Dr. Rabun"), George W. Woods, Jr. ("Dr. Woods"), and Dr. Faye E. Sultan ("Dr. Sultan")–who had recently examined him.

The medical records submitted to the trial court show that Thompson has engaged in self-destructive acts from the time his incarceration began, including swallowing poison, cutting his wrist and arms, and burning his hand and face. Prison doctors began prescribing medication, including Lithium, to control Thompson's "mood swings" as early as 1988. (Joint Appendix ("J.A.") at 314.) A medical report from 1988 indicated that Thompson heard "voices" and believed he had gotten a "snake bite" on his finger and chest. (J.A. at 316.) In 1989, prison doctors diagnosed Thompson on two different occasions as "schizophrenic, paranoid type" and as having "bipolar affective disorder." (J.A. at 317, 324.) Thompson was given prescriptions for Klonopin and Trilafon when he refused to take his Lithium prescription. The psychiatrist who diagnosed him at that time reported that Thompson had been "displaying active evidence of psychosis and mania with marked grandiosity and delusional thought content." (J.A. at 324.) Thompson was continually diagnosed as bipolar or schizophrenic throughout his incarceration. In 1995, a prison doctor deemed Thompson a "mental health emergency" because his mental illness was causing "an immediate threat of serious physical harm to the inmate/patient or to others as a result of [his] violent behavior[.]" (J.A. at 343.) The doctor's report noted that "voluntary . . . medication" had been "ineffective[.]" (*Id.*) According to a physician who evaluated Thompson in 2001, Thompson had been "violent at times" and had "assaulted staff in the recent past which appears to be related to his mental illness." (J.A. at 405.)

Dr. Rabun, a forensic psychiatrist in the pretrial evaluation unit of the St. Louis Psychiatric Rehabilitation Center in Missouri, interviewed Thompson for two and one-half hours on March 17, 2003 and for another two hours on January 19, 2004. Dr. Rabun also read Thompson's medical records and court files, and the reports of other mental health experts who had evaluated him since his incarceration began. Thompson told Dr. Rabun that he has heard voices intermittently since at least the time of his conviction, and that the voices become less acute when he takes antipsychotic medication. Thompson also shared a number of delusions with Dr. Rabun, including that he has written "most of the songs you hear on the radio;" that he has millions of dollars, gold bars and "a Grammy award" buried near a

church in Thomaston, Georgia; and that the United States Navy owes him back pay dating back to 1979. (J.A. at 441.)

Thompson told Dr. Rabun that he "killed Brenda Lane," that he had been convicted of first-degree murder, and that he had been sentenced to "death" in connection with the killing. (J.A. at 442, 447.) Thompson also informed Dr. Rabun that because he was "a lieutenant in the Navy" and therefore had a right to be tried by a jury of "professionals," his conviction should be overturned; only the "Secretary of the Navy" could decide to execute him. (J.A. at 442, 448.) Thompson said that "once everyone sees I am a lieutenant, the Secretary of the Navy will take control, and the case will be thrown out." (J.A. at 442.) Thompson elaborated that when his buried fortune and Grammy award are discovered, he will be deemed "rehabilitated." (*Id.*) Thompson told Dr. Rabun that he preferred execution by electrocution, because "I am used to being shocked, every time I touch my TV, I get shocked, or when I went to a chiropractor in 1982, he twisted my neck, and it felt like a shock." (J.A. at 448.)

Dr. Rabun diagnosed Thompson as schizophrenic, hallucinatory and delusional. Having reviewed Thompson's medical records, Dr. Rabun stated that Thompson likely had been suffering from a psychotic illness for more than ten years, and that his illness was particularly severe when he did not take antipsychotic medications. Dr. Rabun ruled out "a physical or neurological disorder" as the cause of Thompson's condition, and rejected the possibility that Thompson had been "malingering." (J.A. at 446.) Dr. Rabun concluded that in his opinion, Thompson "lacks the mental capacity to understand the fact of the impending execution and the reason for it." (J.A. at 449.)

Dr. Woods, a psychiatrist, examined Thompson on February 17, 2004 for approximately three hours, and also reviewed Thompson's medical records, court file and transcripts from his legal proceedings. Dr. Woods reported that "Thompson believes that he can not die, and there will be a two-year period in which he will stay alive, even if he were executed." (J.A. at 463.) Dr. Woods stated that Thompson "denied . . . that electrocution would, in fact, eliminate his life." (*Id.*) In addition to sharing with Dr. Woods the same delusions reported by Dr. Rabun, Thompson also told Dr. Woods that "after death . . . he was going to be in Hawaii." (*Id.*) Dr. Woods diagnosed Thompson as a

schizophrenic "suffer[ing] from a severe mental illness with psychotic features." (*Id.*) Dr. Woods noted that Thompson suffers from extreme delusions and hallucinations, even while compliant with his prescribed medication regimen. Like Dr. Rabun, Dr. Woods concluded that Thompson is not competent to be executed.

Dr. Sultan, a clinical psychologist and forensic consultant, submitted a letter dated February 27, 2004, in which she stated that she had conducted eleven clinical interviews of Thompson since 1998, with her most recent interview on January 28, 2004. Dr. Sultan stated her belief that Thompson has been schizophrenic "at least since early adulthood," and reported that Thompson "has experienced the delusions, hallucinations, disorganized thinking, and disorganized speech and behavior that are all characteristic of his particular psychiatric illness." (J.A. at 485.) Dr. Sultan stated that she had observed Thompson off his medication, and concluded that "[i]n a non-medicated state, Mr. Thompson is floridly psychotic." (J.A. at 486.) Without medication, she stated, Thompson is "unaware of his surroundings," "largely incomprehensible," and "completely unaware about the reason for his incarceration, the sentence he had received, or the fact of impending execution." (*Id.*) Even with medication, Thompson "continues to exhibit the major symptoms of Schizophrenia," "has no real sense of his actual legal situation" and "lacks the understanding that the State of Tennessee could legally execute him." (J.A. at 486-87.) Dr. Sultan cited the same delusions that the other medical experts noted, including Thompson's claims of buried fortune in Georgia, his military rank and his pending re-trial by a "professional" jury. (*Id.*) Sultan concluded that Thompson "currently lacks the capacity to understand the fact of his scheduled execution or the reason for it." (J.A. at 487.)

In addition to his medical records and the reports and affidavits from the three experts, Thompson also presented the trial court with evidence that in 2001 the state had petitioned a Tennessee court for the appointment of a conservator to make decisions on Thompson's behalf regarding his mental health and medical treatment. The conservatorship petition cited Thompson's "long history of [b]ipolar [d]isorder and psychic symptoms," as well as Thompson's failure to comply with his medication prescriptions. (J.A. at 414.) In October 2003, a state court terminated the conservatorship after finding that Thompson was voluntarily taking his medication.

On March 8, 2004, the trial court denied Thompson's incompetency petition without holding an evidentiary hearing, finding that Thompson had not made the requisite threshold showing of incompetency to warrant such a hearing. The trial court found that "all three of the expert reports . . . demonstrate clearly that Thompson is presently aware that he is under a death sentence for the murder of Brenda Lane under the 'cognitive' standard established by the Supreme Court." (J.A. at 561.)

The Tennessee Supreme Court affirmed the trial court on May 12, 2004. The court found that although the expert reports indicated that Thompson is currently suffering from "schizophrenia, chronic undifferentiated type, the reports do not present facts indicating that Thompson is unaware of his impending execution and the reason for it." *Thompson v. State*, 134 S.W.3d 168, 179 (Tenn. 2004). The court dismissed Thompson's documented history of mental illness as "stale" and "not relevant to the issue of *present* competency." *Id.* at 178. The court cited Thompson's ability to recount certain details of his crime, and his statements showing that he knows about his death sentence for the murder, as evidence that he is aware of his execution and the reason for it. *Id.* at 180-81. The court also cited Thompson's assertion to Dr. Woods that he will live for two years after his "execution," and his statement to Dr. Sultan that it is impossible for him to be executed, as further evidence that Thompson understands that an execution is going to take place. *Id.* at 182. The court acknowledged Thompson's delusions, but stated that "[t]his Court previously rejected a prisoner's reliance on such delusional or unorthodox beliefs as irrelevant to the question of competency for execution." *Id.* at 180.

On June 14, 2004, Thompson filed a federal habeas petition challenging the state court's competency ruling, and on June 21, 2004, the district court stayed Thompson's execution pending the outcome of the habeas petition. However, Thompson's habeas proceeding concerning his incompetency was stayed when, on June 23, 2004, this Court amended and reversed its January 9, 2003 ruling affirming the denial of Thompson's original habeas petition. The state appealed this Court's amended decision, and on June 27, 2005, the Supreme Court held that this Court had abused its discretion by withholding the mandate of its original judgment for more than five months after the Supreme Court denied rehearing on Thompson's petition for writ of certiorari. *Bell v. Thompson*, 545 U.S. 794, 813-14 (2005).

Following the Supreme Court's denial of rehearing on August 22, 2005, the district court resumed Thompson's habeas petition based upon incompetency, which, by that time, had been stayed for more than one year.  Thompson argued that because so much time had passed, he should have the opportunity to update the state courts on his present condition.  On September 16, 2005, the district court lifted the stay of execution so Tennessee could set a date for Thompson's execution and Thompson could re-petition the Tennessee Supreme Court.  The Tennessee Supreme Court set an execution date of February 7, 2006, and on September 23, 2005, Thompson submitted to that court a petition, authorized under the procedure set forth in *Van Tran*, 6 S.W.3d at 272, showing that a substantial change in his condition had occurred since the court's previous ruling (Thompson's "substantial change petition").

Thompson argued in his substantial change petition that since he filed his first incompetency petition, Thompson's delusions had expanded, and his medications no longer worked.  Thompson included with his petition two affidavits from Dr. Sultan based on her evaluations of Thompson on July 28, 2005 and November 7, 2005.  In the first evaluation, Dr. Sultan found that Thompson's "psychological condition had deteriorated" and that it included "a new set of irrational beliefs." (J.A. at 1249.) Dr. Sultan reported that Thompson believed his execution and involvement in Brenda Lane's murder were all "predestined," and that all of the events of his life were written on a note that is "buried at the church" and will prevent him from being executed when it is discovered. (*Id.*) Dr. Sultan concluded that Thompson "can speak about the subject of death on a purely theoretical level but cannot rationally talk about his own death." (*Id.*) Dr. Sultan's second evaluation confirmed that Thompson was continuing to deteriorate.  Thompson's substantial change petition also included a new claim that if Thompson is rendered competent for execution only because of the medication he takes involuntarily, then the execution is barred by the Eighth Amendment.  On December 13, 2005, the Tennessee Supreme Court denied Thompson's petition, finding that no substantial change had occurred.  The court did not address Thompson's additional Eighth Amendment claim.

Thompson then resumed his habeas petition based upon incompetency in the district court.  On March 17, 2006, Thompson amended the petition to add the Eighth Amendment claim that he had just presented to the Tennessee Supreme Court with his substantial change

petition. On May 4, 2006, the district court dismissed Thompson's petition, finding that the state courts' decisions on Thompson's present competency for execution were neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts before them. With respect to Thompson's claim that it is unconstitutional to execute a prisoner rendered competent through medication, the district court determined that the claim was both in procedural default and time-barred, and that Thompson had failed to state a claim in any event. The district court issued a certificate of appealability with respect to Thompson's original claim of incompetency. Thompson timely appealed. On June 20, 2007, this Court expanded the certificate of appealability to include Thompson's second incompetency claim as well.

## II.    Thompson's Rule 60(b) Motion

In his original § 2254 petition brought in 2000 to challenge his conviction and death sentence, Thompson raised twenty-two ineffective assistance of counsel claims. Four of those claims were that his trial counsel (1) did not confront and cross-examine a psychiatric expert testifying for the government, (2) did not object to the prosecutor's improper references to Thompson's failure to testify or present a defense, (3) did not inform the court about the prosecutor's racist remark in the presence of the jury, and (4) failed to present mitigating evidence during the sentencing phase to show he would not be disruptive in prison. On collateral review, Thompson had appealed these four claims to Tennessee's court of criminal appeals, but had not sought discretionary review of these claims with the Tennessee Supreme Court.

When the district court dismissed Thompson's first habeas petition on February 17, 2000, it dismissed these four ineffective assistance claims for procedural default because of Thompson's failure to seek discretionary review of the claims. The district court therefore did not reach the merits of these claims. When Thompson appealed the district court's dismissal of his petition, he did not specifically challenge the district court's procedural default ruling with respect to these four ineffective assistance claims. On June 28, 2001, while Thompson's appeal of the dismissal of his other claims was pending before this Court, the Tennessee Supreme Court promulgated Tennessee Supreme Court Rule 39 ("TSCR 39"), which clarified that litigants need not appeal criminal convictions or post-conviction relief

actions to the Tennessee Supreme Court to exhaust their appeals. Thompson did not seek an expansion of this Court's certificate of appealability after TSCR 39 was issued. As already noted, this Court initially affirmed the district court's dismissal of Thompson's original habeas petition in January 2003. *Thompson*, 315 F.3d at 571. Following this Court's attempt to amend its ruling and the Supreme Court's subsequent reversal, this Court issued its mandate to the district court to dismiss the petition on December 1, 2005.

On January 20, 2006, Thompson filed a motion pursuant to Fed. R. Civ. P. 60(b)(6) in the district court, alleging that the promulgation of TSCR 39 was an extraordinary circumstance warranting the re-opening of his original habeas petition. On March 27, 2006, the district court denied the motion, and denied a certificate of appealability. Thompson timely appealed, and this Court granted a certificate of appealability on June 19, 2007.

Thompson's appeals of the district court's dismissal of his petition based upon his incompetency and its denial of his Rule 60(b) motion have been consolidated before this Court.

**DISCUSSION**

I.     **Thompson's Incompetency for Execution**

A.     **Standard of Review**

This Court reviews a district court's dismissal of a petition brought pursuant to 28 U.S.C. § 2254 *de novo*, but reviews the district court's factual findings for clear error. *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005).

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a federal court may not grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits unless (1) the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or (2) the state court's decision "was based on an unreasonable application of the facts in light of the evidence presented in the State court proceedings." § 2254(d)(2). A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law

or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  An "unreasonable application" occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state court decision unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.   Rather, the state court decision must be an "objectively unreasonable" application of federal law to be reversed.  *Id.* at 409.  A habeas court must presume the state court's factual findings are correct.  28 U.S.C. § 2254(e)(1).

### B.       Analysis

"[T]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).  The Supreme Court derived this principle from reasons found in the "common law" that presently "have no less logical, moral, and practical force than they did when first voiced." *Id.* at 409. In *Ford*, Justice Powell stated in a concurrence to the four-justice plurality opinion that prisoners are insane for the purposes of execution if they are "unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422.  Powell also opined that a state may, consistent with due process, presume a prisoner who was competent to stand trial is sane at the time of execution, and "may require a substantial threshold showing of insanity merely to trigger the hearing process." *Id.* at 426.  Powell's concurrence, needed to create a majority, became the controlling opinion in *Ford* and "constitutes 'clearly established' law for purposes of § 2554." *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007).

The *Panetti* Court clarified *Ford*'s competency-for-execution and "substantial threshold showing" standards.  551 U.S. at 948-62.  In *Panetti*, the state court had denied the petitioner an evidentiary hearing despite his incompetency petition including "a letter and a declaration from . . . a psychologist and a law professor[] who had interviewed petitioner while on death row," *id.* at 938, as well as "references to the extensive evidence of mental dysfunction considered in earlier legal proceedings," *id.* at 950.  On habeas review, the

district court found that the petitioner's motion had been sufficient to meet the "substantial threshold showing" requirement, and the court therefore held an evidentiary hearing. At the hearing, four experts testified that the petitioner had a "schizo-affective disorder . . . resulting in a genuine delusion . . . [that] recast petitioner's execution as part of spiritual warfare . . . between the demons and the forces of the darkness and God and the angels and the forces of light." *Id.* at 954 (quotations omitted). According to the petitioner's experts, the petitioner understood that the state wanted to execute him for the murders he committed, but "believe[d] in earnest that the stated reason is a 'sham' and the State in truth want[ed] to execute him 'to stop him from preaching.'" *Id.* at 955. The district court denied the petitioner's incompetency claim because "the Fifth Circuit test for competency to be executed requires the petitioner know no more than the fact of his impending execution and the factual predicate for the execution." *Id.* at 941-42. The Court of Appeals affirmed.

The Supreme Court in *Panetti* first confirmed that the petitioner had made the substantial threshold showing when he filed his motion with the state court, and under *Ford* was therefore constitutionally entitled to an evidentiary hearing. *Id.* at 950. The Court cited both the expert reports and the petitioner's documented history of mental illness in reaching this conclusion. *Id.* However, with respect to the competency standard applied by the lower courts, the Supreme Court stated that "the Court of Appeals' standard is too restrictive to afford a prisoner the protections granted by the Eighth Amendment." *Id.* at 956-57. The Court elaborated:

> The Court of Appeals' standard treats a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crimes as the reason for his execution. Yet the *Ford* opinions nowhere indicate that delusions are irrelevant to "comprehen[sion]" or "aware[ness]" if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the opposite. . . .
>
> . . . .
>
> . . . The principles set forth in *Ford* are put at risk by a rule that deems delusions relevant only with respect to the State's announced reason for a punishment or the fact of an imminent execution, as opposed to the real interests the State seeks to vindicate. We likewise find no support elsewhere in *Ford*, including in its discussions of the common law and the state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the

stated reason for his execution. A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it. *Ford* does not foreclose inquiry into the latter.

. . . .

. . . It is therefore error to derive from *Ford*, and the substantive standard for incompetency its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted.

*Id.* at 958, 959, 960 (internal citations omitted).

In Thompson's case, the Tennessee Supreme Court properly identified the standard by which to determine competency when it stated *Ford*'s rule that a prisoner must be able to understand the impending execution and the reason for it.[1] *Thompson*, 134 S.W.3d at 176. Accordingly, Thompson's petition may only be granted if the state courts unreasonably applied that standard to the facts of Thompson's case. *See Williams*, 529 U.S. at 411. As *Panetti* makes clear, the state courts' dismissal of Thompson's petition without conducting an evidentiary hearing was an unreasonable application of *Ford*'s tenets.

First, the Tennessee Supreme Court unreasonably applied *Ford* when it determined that Thompson's "severe delusions" are "irrelevant" to a *Ford* competency analysis. *See Panetti*, 551 U.S. at 960 ("It is therefore error to derive from *Ford* . . . a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted."). Thompson's delusions relate to precisely the two concepts that Justice Powell required a prisoner to understand to be competent: his impending execution and the reason for it. *See Ford*, 477 U.S. at 422. With respect to Thompson's understanding of his execution, he believes that only the Secretary of the Navy can execute him; that electrocution will not "eliminate his life," but that he will live for at least two more years after being electrocuted; and that he will be re-tried for the crime once a "professional"

---

[1]In *Coe v. Bell*, 209 F.3d 815, 824-26 (6th Cir. 2000), this Court held that Tennessee's standard and procedures for determining incompetency for execution follow the dictates of Powell's concurrence and are therefore constitutional.

jury is constituted. With respect to Thompson's understanding of the reason for his execution, although he seems to know on some level that it is for "kill[ing] Brenda Lane," his understanding of the connection between his act of murder and the execution appears to be cursory at best, since he seems to believe that when his buried riches are discovered, he will be exonerated.

Second, the Tennessee Supreme Court's determination that Thompson's documented history of mental illness is equally "irrelevant" to the question of his present incompetency was also unreasonable. *See Panetti*, 551 U.S. at 950 (citing petitioner's "extensive evidence of mental dysfunction considered in earlier legal proceedings" as part of the basis for his threshold showing). Although the court was correct that only Thompson's present competency was at issue, his medical records are relevant to that question, particularly to the extent that they demonstrate a chronic mental condition, or a condition that has only worsened over time. Thompson's medical history demonstrates his "long history of bipolar disorder and psychic symptoms," and that he has been psychotic and delusional since at least 1989. While this history is not definitive proof of Thompson's current incompetency for execution, it is at least probative of the seriousness of his illness and whether it is chronic.

Regardless of whether Thompson's incompetency petition should be granted, his evidence has at least created a genuine issue about his competency, and therefore warrants an evidentiary hearing. Thompson included extensive evidence of his incompetency in his petition, including (1) the reports of three medical experts, two of whom had recently examined Thompson on multiple occasions; (2) a long documented history of delusions and psychosis; and (3) the state's previous effort to appoint a conservator to make medical decisions on his behalf–essentially an acknowledgment by the state that Thompson was mentally ill. The conservatorship was terminated less than five months prior to Thompson's competency petition filing, and only because a court found Thompson had become voluntarily compliant with his drug program. The evidence Thompson submitted was undoubtedly a "substantial threshold showing," and therefore an evidentiary hearing should have been held.

Because the Tennessee courts unreasonably applied federal law clearly established by *Ford*, this Court does not afford AEDPA deference to their dismissal of Thompson's petition. "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953. Accordingly, this Court will remand the action to the district court to conduct Thompson's incompetency hearing and decide the merits of his incompetency claim *de novo*.

## II.    Competency Through Involuntary Medication

Thompson alleges that he is "involuntarily" taking antipsychotic medication, and that it is unconstitutional to execute him if he is rendered competent through the forced administration of medication (Thompson's "chemical competency claim"). Thompson alleges that, having been forced to take medication in the past through the conservatorship proceedings, he could be required to take the medication again if he ever stopped voluntarily taking it. Thompson also contends that he has been subjected to physical abuse by prison guards when he has refused medication in the past. Finally, Thompson states that he is currently addicted to the medication, and is now physically incapable of living without medication. The district court dismissed this claim as procedurally defaulted, and found that even if it were not procedurally barred, it would be untimely, and that in any event, Thompson failed to state a claim.

### A.    Procedural Default

The district court dismissed Thompson's chemical competency claim for procedural default because Thompson "fail[ed] to fairly present his claim to the state courts before offering it as a federal constitutional violation in a habeas proceeding." *Thompson v. Bell*, No. 04-CV-177, 2006 WL 1195892, at *30 (E.D.Tenn. May 4, 2006). The district court acknowledged that Thompson raised his chemical competency claim with his substantial change petition, but found that the incompetency-for-execution procedures set forth in *Van Tran* prohibited Thompson from raising any other claims

along with his claim that his condition had substantially changed.  *Id.* (citing *Van Tran*, 6 S.W.3d at 272).

"In determining whether a procedural default has occurred and, if so, what effect the default will have on federal review of a state conviction, the district court must consider whether (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief." *Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003).  "[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case 'clearly and expressly states that its judgment rests on a state procedural bar.'" *Id.* at 791 (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)).  However, even if the state court failed to reject a claim on a procedural ground, the petitioner is also in procedural default "by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 846-7 (1999)); s*ee also Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) ("A federal court is also barred from hearing issues that could have been raised in the state courts, but were not[.]").  The corollary to this rule is that where a petitioner raised a claim in the state court but in violation of a state's procedural rule, a state court must expressly reject the claim on that procedural ground for a federal court to deem the claim defaulted.  *See Williams*, 460 F.3d at 806 (noting that a state court's expressed rejection of a petitioner's claim on procedural basis and petitioner's complete failure to raise a claim in state court are the two ways a claim can be in procedural default).

Thompson formally raised his chemical competency claim in his substantial change petition to the Tennessee Supreme Court in September 2005; he included the chemical competency claim with that petition.  The Tennessee Supreme Court did not address the claim in its December 13, 2005 order denying that a substantial change had occurred.

According to the district court, Thompson violated a state procedural rule, purportedly set forth in *Van Tran*, that a petitioner filing a substantial change petition may not raise any claims for the first time with his substantial change petition. Yet the only statement in *Van Tran* regarding a petitioner's motion for a finding of substantial change is as follows:

> If a prisoner is found to be competent, subsequent *Ford* claims will be disallowed unless the prisoner, by way of a motion for stay, provides this Court with an affidavit from a mental health professional showing that there has been a substantial change in the prisoner's mental health since the previous determination of competency was made and the showing is sufficient to raise a substantial question about the prisoner's competency to be executed.

*Van Tran*, 6 S.W.3d at 272. Although the district court concluded from this statement that Tennessee forbids a petitioner from bringing any new claims related to his incompetency for execution along with his substantial change petition, nothing in *Van Tran* explicitly states such a rule; in fact, the reference in Van Tran to "subsequent *Ford* claims," in the plural, indicates that *Van Tran* anticipated that other incompetency claims would be brought in addition to a claim of substantial change. Regardless, even if such a limitation existed, the Tennessee Supreme Court, in denying Thompson's petition for a finding of substantial change, did not refer to it. The court rejected Thompson's argument that substantial change in his mental condition had occurred, and did not address or even mention Thompson's chemical competency argument.

The district court, in finding procedural default, cited *Castille v. Peoples*, 489 U.S. 346, 351 (1989), for the proposition that a claim is not fairly presented to a state court where the claim is presented "in a procedurally inappropriate manner which renders consideration on its merits unlikely." *Thompson v. Bell*, No. 04-CV-177, 2006 WL 1195892, at *30 (E.D. Tenn. May 4, 2006). However, the district court misinterpreted *Castille*, which held only that, where a habeas petitioner had the opportunity to raise a claim in the state courts on direct appeal but only raised it for the first time on discretionary review, such a claim is not fairly presented. 489 U.S. at 351; *see also Clinkscale v. Carter*, 375 F.3d 430, 440 (6th Cir. 2004) (finding that *Castille*'s

holding did not require a finding of procedural default because, "[u]nlike the petitioner in *Castille*, Clinkscale raised his [constitutional] claim on direct appeal, *in which there were no special limitations on the ability of the [state court] to reach the merits of that claim*") (emphasis added).  Certainly, every time a claim is presented to a state court in violation of its own procedural rule, it is "unlikely" that the state court would consider its merits, but we nevertheless require a state court to expressly deny such a claim based on the procedural rule in order for the claim to be in procedural default.  *See Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) ("The mere existence of a basis for a state procedural bar does not deprive [federal courts] of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.").  In Thompson's case–where it is unclear that there even was a state rule that barred him from raising his chemical competency claim–an express statement from the state court is even more necessary.

Because Thompson indisputably presented his chemical competency petition to the Tennessee Supreme Court in his substantial change petition, this is not a case where we can find procedural default in spite of that court's failure to reject the claim on a procedural ground.  *See Williams*, 460 F.3d at 806.  Because the state court did not "clearly and expressly state[] that its judgment rests on a state procedural bar," the rules of procedural default did not bar the district court from considering the claim.  *See Frazier*, 343 F.3d at 790.  Thus, Thompson's chemical competency claim is not procedurally barred.

### B.        Statute of Limitations

Respondent argues, and the district court found, that even if Thompson did not procedurally default on his chemical competency claim, his claim is still time-barred.  With exceptions not relevant here, federal habeas petitioners in custody pursuant to a judgment in a state court must file their petitions within one year of the date judgment becomes final on direct review or the time to seek such review expires.  28 U.S.C. § 2244(d)(1)(A).  Because Thompson presented his chemical competency claim to the Tennessee Supreme Court on September 23, 2005, in his substantial change petition, the

state courts' judgment with respect to the chemical competency claim first became final on December 13, 2005, when the Tennessee Supreme Court denied Thompson's substantial change petition without addressing his chemical competency claim. Thompson amended his federal habeas petition to include his chemical competency claim on March 17, 2006, well before the one-year limitations period expired. Accordingly, Thompson's chemical competency claim is not barred by the statute of limitations.

### C.      Failure to State a Claim

#### 1.      Standard of Review

"If deference to the state court is inapplicable or inappropriate, we 'exercise our independent judgment' and review the claim *de novo*." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). "Where the state court has not addressed or resolved claims based on federal law, most courts, including this one, have held that the decision is not an 'adjudication on the merits.' Thus, a federal habeas court reviews such unaddressed claims *de novo*." *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005). Because the Tennessee state courts did not adjudicate Thompson's chemical competency claim on the merits, there is no state court decision to which this Court can defer pursuant to 18 U.S.C. § 2254(d). Accordingly, this Court reviews the district court's adjudication of Thompson's chemical competency claim *de novo*. In reviewing the district court's determination that Thompson failed to state a claim, this Court accepts Thompson's factual allegations supporting the claim as true. *See Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998).

#### 2.      Analysis

Neither the Supreme Court nor the Sixth Circuit has squarely addressed whether the Eighth Amendment's prohibition on cruel and unusual punishment prohibits rendering a prisoner competent for execution through involuntary medication. However, in addressing previous Due Process claims, the Supreme Court has recognized that mentally ill state prisoners have a "significant liberty interest" in avoiding unwanted

antipsychotic drugs. *Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *Riggins v. Nevada*, 504 U.S. 127, 134-35 (1992). Considering whether a state may forcibly medicate a defendant to render him competent to stand trial, the Supreme Court has held that a state may do so only if the treatment is (1) "*medically appropriate*, *i.e.*, in the patient's best medical interest in light of his condition;" (2) "substantially unlikely to have side effects that may undermine the fairness of the trial;" and (3) "necessary significantly to further important governmental trial-related interests," given less intrusive alternatives. *Sell v. United States*, 539 U.S. 166, 179-81 (2003) (emphasis in original). Although the Court in *Sell* found forcible medication permissible in that case because "important governmental interests are at stake" when the state tries to bring a defendant to trial, the Court added: "Special circumstances may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill–and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* at 180. Thus, the *Sell* Court reiterated the importance of a prisoner's interest in avoiding forcible medication, and signaled that it may be unconstitutional to medicate a prisoner already destined for a lengthy confinement just to render the prisoner competent for legal proceedings.

Although the Supreme Court in *Harper*, *Riggins and Sell* addressed due process challenges and not Eighth Amendment claims, the logical inference from these holdings is that subjecting a prisoner to involuntary medication when it is not absolutely necessary or medically appropriate is contrary to the "evolving standards of decency" that underpin the Eighth Amendment. *See Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) ("[T]he words of the [Eighth] Amendment are not precise, and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."). Moreover, the main reason why Justice Powell viewed the execution of insane prisoners as "cruel"–that their inability to understand the reason for their punishment robs them of "the opportunity to prepare, mentally and spiritually, for their death," *Ford,* 477 U.S. at 421–applies with equal force to those who have been rendered chemically competent involuntarily. If forced

medication reduces a prisoner's delusions and controls his outward behavior, but does not improve his understanding of his impending death or his ability to prepare for it, it is quite possible that the prisoner cannot be executed under the principles of *Ford*.

The concurring opinion, certain that prior Supreme Court precedent has already precluded such a claim, impermissibly ties loose strands of prior precedents together to reach its conclusion. Essentially, our concurring colleague surmises that because the Supreme Court has held that forced medication is not inherently unconstitutional, and that executions are not inherently unconstitutional, the execution of a prisoner rendered competent through medically appropriate forced medication *must* be constitutional. This leap of logic ignores the Supreme Court's repeated recent willingness to deem unconstitutional the execution of prisoners who the state previously had a legitimate right to execute–including those with mental or developmental deficiencies. *See, e.g., Atkins v. Virginia*, 536 U.S. 304 (2002) (prohibiting the execution of mentally retarded defendants); *Roper v. Simmons*, 543 U.S. 551, 563 (2005) (applying *Atkins* to prohibit execution of prisoners who were under eighteen years of age at the time of their capital crimes). We simply do not share the concurring opinion's certainty that, given the Eighth Amendment's "*evolving* standards of decency," *Trop*, 356 U.S. at 100-01 (emphasis added), a state's right to execute a prisoner constitutionally hinges on administering pharmaceuticals that give an otherwise incompetent prisoner the appearance of competence.[2]

Regardless, in this case, it is not necessary to resolve these difficult questions, because regardless of whether the Eighth Amendment prohibits the execution of a prisoner rendered competent through the forced administration of medication, the district court did not err in holding that Thompson failed to state a claim. Even accepting all of Thompson's allegations as true, he is not being forcibly medicated right now. Although he may be right that the state would forcibly medicate him if he stopped taking his

---

[2]The concurring opinion mischaracterizes our view as stating that the execution of those rendered chemically competent "likely" violates the Eighth Amendment. Concurring Op. at 28. We do not go so far. Rather, we note only that it is *possible*, under some circumstances, that such an act would amount to a constitutional violation for the reasons discussed.

medication voluntarily, those are not the facts he presents to us. Thompson's argument that his medication is involuntary because he is addicted to the drugs may be accurate from a physiological perspective, but does not amount to an allegation that the state is ordering him to take medication. Because this appeal does not present the case of a prisoner who may only be competent by way of forced medication, this Court will leave the question of whether executing the "chemically competent" constitutes cruel and unusual punishment for another day. The district court's dismissal of Thompson's chemical competency claim is affirmed, without prejudice to Thompson raising a chemical competency claim in the future should he be forcibly medicated.[3]

## III.    Thompson's Rule 60(b)(6) Motion

In the appeal of his other claims, Thompson argues that the Tennessee Supreme Court's promulgation of TSCR 39, which clarified that criminal defendants do not need to appeal their post-collateral relief actions to the Tennessee Supreme Court to exhaust their claims, demonstrates that the district court erred when it dismissed four of his ineffective assistance claims as procedurally defaulted. Thompson argues that because the district court erred, it abused its discretion in denying his subsequent motion pursuant

---

[3]The concurring opinion also argues that Thompson's chemical competency claim is actually an attack on his original conviction and sentence, and therefore should have been barred as a second or successive petition prior to our reaching the merits. As should be obvious, because the state was not forcibly medicating Thompson or even considering doing so at the time of his conviction and sentence, a claim challenging his competence through forced medication would not have been ripe. *See Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (claim unripe for judicial review unless "it arises in a concrete factual context and concerns a dispute that is likely to come to pass"). Remarkably, although our concurring colleague agrees with us that *even now*, Thompson has failed to state a claim because he is not being forcibly medicated, he nevertheless believes that Thompson would somehow have been able to state a claim at his original sentencing, despite not being forcibly medicated at that time. How the concurring opinion can in one breath agree that the necessary factual predicate to Thompson's claim has not occurred, and in another breath argue that Thompson never needed any such factual circumstances to occur because his claim is a purely "legal" one, is beyond comprehension.

As the concurrence at least recognizes, the only appellate court to have addressed a chemical competency claim voted 10-1 that a chemical competency claim arises only when the defendant is subject to a forced medication order and execution is imminent. *See Singleton v. Norris*, 319 F.3d 1018, 1027 (8th Cir. 2003) (Loken, J., concurring in the judgment but dissenting on that ground). This Court agrees with that holding, and for this reason, the concurring opinion's statement that "Thompson was under a sentence of death and claims to have been involuntarily medicated back in 1995," Concurring Op. at 35, n.4, is irrelevant, since Thompson's execution was not imminent at that time. Moreover, even if Thompson has asserted that he was forcibly medicated in 1995, he does not make such an assertion before this Court on appeal.

to Fed. R. Civ. P. 60(b)(6) to re-open his original habeas petition with respect to those claims.  We agree.

### A.    Standard of Review

This Court reviews the district court's denial of a motion pursuant to Rule 60(b)(6) for abuse of discretion. *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006).  "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Burrell v. Henderson*, 434 F.3d 826, 831 (6th Cir. 2006) (quotation marks and citation omitted).   "Rule 60(b) proceedings are subject to only limited and deferential appellate review." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005).

### B.    Analysis

"On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . (6) any other reason justifying relief from the operation of the judgment." Fed R. Civ. P. 60(b)(6).  "[R]elief under Rule 60(b)(6) . . . requires a showing of 'extraordinary circumstances,'" *Gonzalez*, 545 U.S. at 536, and must "be made within a reasonable time," Fed. R. Civ. P. 60(c)(1).  "[T]he decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefits Fund*, 249 F.3d 519, 529 (6th Cir. 2001) (quotation marks and citation omitted).

We recently found in *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004) (en banc) ("*Abdur'Rahman I*") that the promulgation of TSCR 39 was an extraordinary circumstance.  Although the Supreme Court subsequently vacated that opinion in *Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005) (*Abdur'Rahman II*), the rationale behind our finding in *Abdur'Rahman I* remains valid.  In *Abdur'Rahman I*, the district court, similarly to the district court in this case, had dismissed the petitioner's habeas claims

as procedurally defaulted for failure to seek discretionary review in the Tennessee Supreme Court. *Abdur'Rahman I,* 392 F.3d at 177. In *Abdur'Rahman I*, this Court reversed the district court and held that the promulgation of TSCR 39 was an extraordinary circumstance warranting relief under Rule 60(b)(6), because the new rule indicated that the district court had failed to recognize a state's own procedural rule–thereby undermining the principle of comity on which AEDPA is based. *Id.* at 186. In *Gonzalez v. Crosby*, 545 U.S. 524, 533 (2005), the Supreme Court addressed another habeas petitioner's Rule 60(b)(6) motion, finding in that case that the petitioner was not entitled to relief. The Court found that a recent Supreme Court decision, which changed the federal courts' interpretation of the statute of limitations in 28 U.S.C. § 2244(d)(2) so as to render timely the petitioner's previously time-barred claims, was not an extraordinary circumstance warranting relief pursuant to Rule 60(b)(6). *Id.* at 536-37. The *Gonzalez* Court noted that "not every interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final." *Id.* at 536. The Supreme Court then vacated this Court's holding in *Abdur'Rahman I* so this Court could reconsider the case in light of *Gonzalez*. *Abdur'Rahman II*, 545 U.S. 1151 (2005). This Court remanded the case to the district court, which found that the promulgation of TSCR 39 was still an extraordinary circumstance after *Gonzalez*. *Abdur-Rahman v. Bell*, No. 3:96-0380, 2008 WL 2002572, at *4 (M.D. Tenn. May 7, 2008).

We agree that the enactment of TSCR 39 is an extraordinary circumstance, and that nothing in the Supreme Court's opinion in *Gonzalez* undermined this Court's reasoning in *Abdur'Rahman I*. Unlike the Supreme Court in *Gonzalez*, which found that a change in federal decisional law by itself was not an extraordinary circumstance, this Court in *Abdur'Rahman I* found the enactment of TSCR 39 to be an extraordinary circumstance because refusing to recognize it "would *disserve* the comity interests enshrined in AEDPA by ignoring the state court's view of its own law." 392 F.3d at 187. A federal court's respect for another state's law was not at issue in *Gonzalez*, in which the Rule 60(b) motion was based solely on a change in federal decisional law interpreting a federal statute. *See also Blue Diamond*, 249 F.3d at 524 ("[A] change in

decisional law is *usually* not, by itself, an 'extraordinary circumstance' meriting Rule 60(b)(6) relief.") (emphasis supplied). Because this Court's reasoning in *Abdur'Rahman I* is still valid after *Gonzalez*, today we reaffirm our previous holding that a motion based upon the promulgation of TSCR 39 is an extraordinary circumstance warranting relief under Rule 60(b)(6).

However, a movant must also file a Rule 60(b)(6) motion "within a reasonable time." Fed. R. Civ. P. 60(c)(1). Although the Federal Rules do not mandate the specific time by which the motion must be filed, a movant's lack of diligence can detract from the extraordinariness of the circumstance. *Gonzalez*, 545 U.S. at 537-38. Whether the timing of the motion is reasonable "ordinarily depends on the facts of a given case including the length and circumstances of the delay, the prejudice to the opposing party by reason of the delay, and the circumstances compelling equitable relief." *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365 (6th Cir. 1990).

In this case, although Thompson did not bring his Rule 60(b) motion until January 20, 2006–more than four years after the promulgation of TSCR 39–the reasons for Thompson's delay are understandable. First, when the Tennessee Supreme Court enacted TSCR 39 in June 2001, it would have been pointless for Thompson to file a Rule 60(b) motion because at that time, Rule 60(b) motions were deemed equivalent to successive habeas petitions.[4] *See, e.g., McQueen v. Scroggy*, 99 F.3d 1302, 1335 (6th Cir. 1996). In *Abdur'Rahman I*, this Court held for the first time that a Rule 60(b) motion which seeks to reopen a final judgment for reasons other than the merits of the petitioner's substantive claim is not the equivalent of a successive habeas petition. 392 F.3d at 182.

Although Thompson theoretically could have filed his Rule 60(b) motion immediately after *Abdur'Rahman I* was published, the appeal of his habeas petition was still pending on that date. This Court did not issue its mandate to the district court to

---

[4]We note that Thompson did inform this Court about the enactment of TSCR 39 by filing a citation of supplemental authority pursuant to Fed. R. App. P. 28(j) on August 1, 2001, prior to oral argument on his appeal of his habeas petition.

dismiss Thompson's habeas petition until December 1, 2005; prior to that date, the district court would not have had jurisdiction to hear his Rule 60(b) motion. *See Pittock v. Otis Elevator Co.*, 8 F.3d 325, 327 (6th Cir. 1993) (Generally, "a district court no longer has jurisdiction over an action as soon as a party files a notice of appeal[.]"). Because Thompson filed his Rule 60(b) motion less than two months after we issued the mandate in his case, which he had been actively appealing until that time, we cannot find a lack of diligence that would detract from the extraordinary circumstance reflected in the promulgation of TSCR 39.

We recognize that where the judgment the movant seeks to reopen has already become final, courts are often reluctant to find an abuse of discretion in a district court's denial of the Rule 60(b) motion. *See, e.g., Stokes v. Williams*, 475 F.3d 732, 736-37 (6th Cir. 2007). However, we must also heed the Supreme Court's admonition that "[c]onventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged." *Sanders v. United States*, 373 U.S. 1, 8 (1963). Courts addressing Rule 60(b) motions must consider the equities, and "the incessant command of the court's conscience that justice be done in light of all the facts." *Blue Diamond*, 249 F.3d at 529; s*ee also Matarese v. Lefevre*, 801 F.2d 98, 106 (2d Cir. 1986) (Rule 60(b) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice; it constitutes a grand reservoir of equitable power to do justice in a particular case. . . . and should be liberally construed when substantial justice will thus be served.") (internal citations and quotations omitted). In this case, the finality of the judgment against Thompson must be balanced against the more irreversible finality of his execution, as well as the serious concerns about ineffective assistance that caused this Court so much angst upon its prior consideration of Thompson's petition. Because Thompson should be heard on the merits of his four remaining ineffective assistance claims, we reverse the district court's denial of Thompson's Rule 60(b) motion.

**CONCLUSION**

For the reasons set forth above, we **REVERSE** the district court's denial of Thompson's Rule 60(b) motion and his habeas petition based upon incompetency, and we **REMAND** for further proceedings. On remand, the district court shall first rule on the merits of Thompson's remaining ineffective assistance claims, and shall only address the incompetency question if it rejects the ineffective assistance claims on their merits. If the court rejects the ineffective assistance claims, it must then conduct an evidentiary hearing to determine Thompson's competency for execution. The district court's dismissal of Thompson's chemical competency claim is **AFFIRMED**.

_____

**CONCURRING IN PART, DISSENTING IN PART**
_____

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part. The Tennessee Supreme Court erred in affirming the Tennessee trial court's decision to reject Thompson's claim that he is incompetent to be executed without holding an evidentiary hearing on his sanity. Thompson's well-documented history of delusions and psychosis–evidenced by, *inter alia*, three medical experts' opinions, prison records spanning almost two decades, and conservatorship proceedings–is relevant in determining whether Thompson is presently aware of his impending execution and the reason for it. *See Ford v. Wainwright*, 477 U.S. 399, 422 (1986). Accordingly, I concur with the majority's conclusion in Section I of the Discussion, *supra*, that Thompson has made a "substantial threshold showing" of insanity sufficient to warrant an evidentiary hearing on Thompson's present competency to be executed. *See Panetti v. Quarterman*, 127 S. Ct. 2842, 2862 (2007); *Ford*, 477 U.S. at 426. A remand to the district court for an evidentiary hearing on Thompson's present competency is required.

I also agree with the majority's conclusion in Section II, *supra*, that Thompson has failed to state a claim that he is presently being involuntarily medicated in violation of the Eighth Amendment (Thompson's "chemical competency claim"). Because the issue of chemical competency is admittedly not properly before us, the majority's discussion on the issue is improper and dicta. However, as the majority has openly done so, I feel compelled to at least briefly explain why, in Section I *infra*, the view taken by the majority is inconsistent with Supreme Court precedent. Also, I write separately to express, in Section II *infra*, that Thompson's decision to raise his "chemical competency claim" in his substantial change petition to the Tennessee Supreme Court was procedurally inappropriate. I also contend that Thompson's chemical competency claim is actually a collateral attack on his sentence and may not be raised in a second or successive habeas petition.

Finally, as demonstrated in Section III *infra*, the majority clearly erred in holding that Thompson's Rule 60(b) motion fails because he has not brought his motion within a "reasonable time" as required under FED. R. CIV. P. 60(c)(1).

## I.

As the majority explains, Thompson formally raised his chemical competency claim for the first time in his substantial change petition to the Tennessee Supreme Court in September 2005. The district court found the claim procedurally defaulted because adding the claim in the substantial change petition was "procedurally inappropriate." *Thompson v. Bell*, No. 04-CV-177, 2006 WL 1195892, at *30 (E.D. Tenn. May 4, 2006). The majority explains that because the Tennessee Supreme Court did not expressly reject the claim based upon a state procedural violation, the claim is not procedurally defaulted. Even if the majority is right, it does not matter because, as the majority expressly holds, Thompson has failed to state a claim that the state is involuntarily medicating him.

Thus, even though the claim is not properly before us, the majority nonetheless proceeds to express its view on the legal issue of whether a state can execute a prisoner rendered competent through involuntary medication. Given the importance of this question, I feel it necessary to point out why the majority's view of this issue–that it is likely "cruel" to execute those who have been rendered chemically competent involuntarily–is inconsistent with Supreme Court precedent.

As the majority correctly notes, there is no Supreme Court decision directly addressing whether the Eighth Amendment forbids a state from involuntarily medicating an insane prisoner to restore his competency for execution. However, *Ford v. Wainwright* and several Supreme Court cases addressing Fourteenth Amendment challenges to involuntary medication make clear that involuntary medication is not inherently unconstitutional and is actually compelled in certain circumstances.

First and foremost, the Supreme Court has deemed the death penalty constitutional. *Gregg v. Georgia*, 428 U.S. 153, 177 (1976); *Furman v. Georgia*, 408

U.S. 238, 241 (1972).[1]  In *Ford v. Wainwright*, the Supreme Court addressed the Eighth Amendment's limitation on a state's power to execute the insane.  The Court found the proscription on executing the insane carried over from England and took hold in our common law at the time the Bill of Rights was adopted.  *Ford*, 477 U.S. at 405, 407-09. The Court recognized many divergent theories for barring the execution of the insane, including moral, theological, and ethical arguments, but the Court held one thing for certain: "The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane."  *Ford*, 477 U.S. at 410.  In his concurrence, Justice Powell offered a narrower opinion:  "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it."  *Id.* at 422 (Powell, J., concurring).  Without a majority opinion, Justice Powell's opinion controlled and set the standard for determining competency for execution.  *Panetti*, 127 S. Ct. at 2856.  While *Ford* limits a state's right to executing the insane, it is an affirmation that the death penalty itself is constitutional.

In *Washington v. Harper*, the Court considered the question of what limit the Due Process Clause places on a state's power to administer antipsychotic drugs to a mentally ill prisoner against his will.  Harper was a state prisoner who suffered from schizophrenia.  *Harper*, 494 U.S. at 214.  When he stopped voluntarily taking antipsychotic medications, the state began medicating him against his will under a state law authorizing involuntary medication "to inmates who are . . . gravely disabled or represent a significant danger to themselves or others."  *Id.* at 226.  In resolving Harper's due process challenge to the forced medication, the Court explained that a prison inmate possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs.  *Id.* at 222.  At the same time, the Court cautioned that the outer

---

[1]Indeed, the Supreme Court has recognized that the government has an essential interest in carrying out a lawfully imposed sentence. *See Moran v. Burbine*, 475 U.S. 412, 426 (1986) (recognizing "society's compelling interest in finding, convicting, and punishing those who violate the law").  Further, "'a State retains a significant interest in meting out a sentence of death in a timely fashion.'" *Cooey v. Strickland*, 479 F.3d 412, 419 (6th Cir. 2007) (quoting *Nelson v. Campbell*, 541 U.S. 637, 644 (2004)). That interest "is at its greatest in the narrow class of capital murder cases in which aggravating factors justify imposition of the death penalty," *Singleton v. Norris*, 319 F.3d 1018, 1025 (8th Cir. 2003) (en banc), and accordingly must also be keenly weighed against an inmate's interest in avoiding involuntary medication.

limits of that liberty interest must be determined within the context of the prisoner's confinement because the state has a counterbalancing interest "in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Id.* at 236. Thus, the Court held that, in a prison setting, "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. *Harper* thereby affirmed a state's right to impose involuntary medication under certain conditions.

Applying *Harper* in the pretrial context, the Court in *Riggins v. Nevada* considered the state's authority to involuntarily medicate a prisoner to render him competent to stand trial on serious criminal charges. *Riggins v. Nevada*, 504 U.S. 127 (1992). The *Riggins* Court reiterated that an individual has a liberty "interest in avoiding the involuntary administration of antipsychotic drugs," *id.* at 134, and explained that only a state's "essential" or "overriding" interest could overcome it, *id*. at 134, 135. The Court explained that rendering an accused competent to stand trial for murder would be one such interest, and held that involuntary medication would not violate due process if the state demonstrated that "treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins'[s] own safety or the safety of others." *Id.* at 135.[2]

The Supreme Court subsequently applied the framework erected by *Harper* and *Riggins* in *Sell v. United States*, 539 U.S. 166 (2003), where the Court articulated a four-part analysis courts must use in determining whether involuntary medication may be used to render a defendant competent to stand trial. The government must establish, by clear and convincing evidence: (1) the existence of an "*important*" governmental interest; (2) that involuntary medication "will *significantly further*" that important interest; (3) that involuntary medication is "*necessary*" to furthering the important

---

[2]However, because Riggins was involuntarily medicated without "*any* determination of the need for [antipsychotic medication] or *any* findings about reasonable alternatives," the Court found a due process violation in that case. *Riggins*, 504 U.S. at 135, 136.

interest; and (4) that the administration of the drugs is "*medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." *Id.* at 180-81.

The *Sell* Court emphasized that the four-part analysis applies when a court "is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial*." *Id.* at 181. However, the *Sell* Court also explained that a court need not conduct the four-part analysis "if forced administration is warranted for a different purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." *Id.* (citing *Harper*, 494 U.S. at 225-26). Guided by *Sell*, this Court now applies the four-part *Sell* standard when the involuntary medication is requested to restore competency to a pretrial detainee and the pretrial detainee is *not* a danger to himself or others, but this Court applies the *Harper* standard if he does pose a danger to himself or others. *See, e.g., United States v. Green*, 532 F.3d 538, 545 & n.5 (6th Cir. 2008).

Additionally, states are constitutionally *required* to provide medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the states through the Fourteenth Amendment's Due Process Clause, requires the state to provide adequate medical care to prison inmates). That duty exists as long as the prisoner is confined and is not extinguished or diminished because the inmate may be under sentence of death. *See, e.g., Singleton*, 319 F.3d at 1026 (reasoning that "the best medical interests of the prisoner must be determined without regard to whether there is a pending date of execution"). Indeed, in this Circuit, we hold the state accountable for "deliberate indifference"–a violation of the Eighth Amendment–if the state culpably fails to treat an inmate's serious medical need. *See, e.g., Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008); *see also Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (defining a serious medical need as "one that has been diagnosed by a physician

as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

In short, as outlined above, the state has the following rights and obligations vis-a-vis prisoners: The state is obligated under the Eighth Amendment and the Due Process Clause to attend to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 103. The state is also not restricted by the Due Process Clause from involuntarily medicating a prisoner if he is a danger to himself or others. *Harper*, 494 U.S. at 223. The state is further permitted under the Constitution to medicate a defendant to render him competent to stand trial. *Sell*, 539 U.S. at 180-81. And the state may carry out the death penalty, *Baze v. Rees*, 128 S. Ct. 1520, 1529 (2008), so long as the prisoner is competent on the eve of his execution, *Ford*, 477 U.S. at 422.

It follows, then, that if all of the predicate acts of carrying out a valid death sentence on a mentally ill inmate are either constitutionally required or permitted, and the death penalty itself is constitutional, the state's imposition of the death penalty to an inmate rendered competent via involuntary medication must also be constitutional. In other words, it is illogical to conclude that while the state has a duty to provide an inmate with medical care and can also render the prisoner competent to stand trial and possibly receive the death penalty, the state is barred from carrying out the death penalty if that medical care successfully reduces the symptoms of a mental illness and, as a result, the inmate regains his competency.

The en banc Eight Circuit is of a similar view. In *Singleton v. Norris*, the en banc court considered analogous issues to those raised by Thompson, namely "the interrelated issues of whether the State may forcibly administer antipsychotic medication to a prisoner whose date of execution has been set and whether the State may execute a prisoner who has been involuntarily medicated under a *Harper* procedure."[3] *Singleton*, 319 F.3d at 1023. Singleton was under a *Harper* order of involuntary medication, which he argued was initially valid while his execution was stayed but which subsequently

---

[3]Of course, as correctly noted by the majority, Thompson has not presented facts that he is being involuntarily medicated by the state.

became unconstitutional once his execution date was set. *Id.* at 1023. The en banc court disagreed, reasoning that the decision to medicate under *Harper* is made based upon the best medical interests of the prisoner, and "must be determined without regard to whether there is a pending date of execution." *Id.* at 1026. Thus, according to the court, "the mandatory medication regime, valid under a pendency of a stay of execution, does not become unconstitutional under *Harper* when an execution date is set." *Id.*

Singleton also claimed that the Eighth Amendment barred his execution because the state was rendering him "artificially competent" especially so that he could be executed. *Id.* The Eighth Circuit rejected that argument too, explaining that "the state was under an obligation to administer antipsychotic medication" and, therefore, any investigation into whether the state had other motives was "unnecessary" and "irrelevant." *Id.* at 1027. The court held, then, that "[a] State does not violate the Eighth Amendment as interpreted by *Ford* when it executes a prisoner who became incompetent during his long stay on death row but who subsequently regained competency through appropriate medical care." *Id.*

Accordingly, based upon the Supreme Court precedent cited above, holding that an involuntarily chemically competent prisoner may not be executed would be problematic because it would tie the hands of state officials who may be involuntarily medicating inmates to satisfy their obligation to provide appropriate medical care and ensure the safety of prison employees and inmates. Those officials would be faced with the Hobson's choice between administering medically appropriate treatments to the mentally ill inmate population under *Harper* and risking the possibility that lawfully imposed sentences may not be carried out. In that instance, it will likely be the inmates in need of medical treatment that suffer.

As the *Singleton* court held, "*Ford* prohibits only the execution of a prisoner who is unaware of the punishment he is about to receive and why he is to receive it." 319 F.3d at 1027. And medications may reduce the symptoms of psychosis enough that a prisoner may be found *Ford*-competent. Medications may further quell the symptoms enough that a prisoner regains "the opportunity to prepare, mentally and spiritually," for

his death. *Ford*, 477 U.S. at 421. Accordingly, a state–which is adhering to either the *Harper* standard in involuntarily medicating a dangerous individual, or simply acting on its responsibility to address the medical needs of its inmates–does not violate the Eighth Amendment by executing a mentally ill inmate who is receiving antipsychotic medications so long as the prisoner meets the *Ford* standard for competency.

## II.

For completeness, I would like to note that it was procedurally inappropriate for Thompson to raise his chemical competency claim in his petition to the Tennessee Supreme Court alleging a substantial change in his mental condition. *Ford* claims are designed to determine whether a prisoner is competent to be executed at the time the execution is imminent. *See, e.g., Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000) ("Coe's *Ford* competency claim was not ripe until his execution was imminent . . . ."). As such, *Ford* claims are distinct from the merits. *See Martinez-Villareal v. Stewart*, 118 F.3d 628, 631 (9th Cir. 1997) (explaining that "competency to be executed is not an issue of guilt or innocence" subject to AEDPA's restrictions on second or successive habeas petitions), *aff'd*, 523 U.S. 637 (1998). That is, *Ford* claims do not affect the underlying validity of the conviction and sentence, but only determine the prisoner's present competency to be executed. *That is all that Ford claims decide*.

In Tennessee, if a prisoner challenges the state's right to execute him on the grounds that he fails to meet the *Ford* standard for competency, the trial court will make a competency determination, which is automatically reviewed by the Tennessee Supreme Court. *See Van Tran v. State*, 6 S.W.3d 257, 271-72 (Tenn. 2004). If, on automatic review, the Tennessee Supreme Court finds the prisoner competent, then the *Van Tran* court explains that "subsequent *Ford* claims will be disallowed" except in one narrow situation: the prisoner,

> by way of a motion for stay, provides this Court with an affidavit from a mental health professional showing that there has been a substantial change in the prisoner's mental health since the previous determination of competency was made and the showing is sufficient to raise a substantial question about the prisoner's competency to be executed.

*Van Tran*, 6 S.W.3d at 272.

In other words, the *Van Tran* court unequivocally states that the sole function of a substantial change petition is to raise a question about the prisoner's present competency for execution after a court has previously found him competent, thereby allowing a prisoner to raise another *Ford* claim. *Id.* It does not authorize a prisoner to bring any other type of claim. Accordingly, it is procedurally inappropriate to add new claims attacking the underlying conviction and sentence, and any new claims would not be "fairly presented" in such a petition. *See, e.g., Castille v. Peoples*, 489 U.S. 346, 351 (1989) (holding that a habeas petitioner's raising of a claim for the first time in two motions for allocutor to the Pennsylvania Supreme Court was not "fair presentation" of the claim because the procedural context in which it was raised rendered consideration on its merits unlikely).

To the extent Thompson argues that Tennessee may not execute him if he is involuntarily medicated, he is attacking the merits of his conviction and sentence, a *legal* argument.[4] As such, Thompson's chemical competency claim is analytically distinct from Thompson's *Ford* claim, which only alleges that he is presently incompetent to be executed, a *fact*-based argument. *See Ford*, 477 U.S. at 422; *Martinez-Villareal*, 118 F.3d at 631; *see also Martinez-Villareal*, 523 U.S. at 643-45 & n.* (1998) (considering "abuse of the writ" cases in deciding whether a habeas petitioner's *Ford* claim is second or successive; however, leaving unresolved whether a "*Ford* claim [raised] for the first

---

[4]Contrary to the majority's characterization in footnote 3 *supra*, I do not contend that the factual predicate necessary to ripen Thompson's claim has not yet occurred. Nor do I suggest that Thompson's claim would have been ripe "at the time of his conviction and sentence" in 1985. Quite to the contrary, the facts necessary to ripen Thompson's chemical competency claim arose in 1995, the year Thompson claims that the state involuntarily medicated him.

The fact that Thompson failed to state a claim that he is *presently* being involuntarily medicated does nothing to change the fact that Thompson was under a sentence of death and claims to have been involuntarily medicated back in 1995.

I also do not suggest that because Thompson's chemical competency claim presents a question of law, it was ripe even before the state ever medicated him. To be clear, I agree with the dissenting view in *Singleton*, 319 F.3d at 1028, that ripening a chemical competency claim requires only that a death-row prisoner is, or is likely to be, under an order of involuntary medication. Unlike a *Ford* claim, the chemical competency claim does not require that an execution date be "imminent." Therefore, the necessary factual predicate had already occurred at the time Thompson presented his initial petition for habeas relief. As such, even though Thompson fails to state a claim that he is *presently* being involuntarily medicated, the chemical competency claim was nonetheless ripe in 1995.

time in a petition filed after the federal courts have already rejected the prisoner's initial habeas application . . . would be a 'second or successive habeas corpus application' within the meaning of AEDPA"). Therefore, Thompson at a minimum should have brought the claim in his initial habeas petition attacking the merits of his conviction and sentence, but he failed to raise the claim in his 1998 habeas petition, which was dismissed on the merits in 2000. *See Thompson v. Bell*, 315 F.3d 566, 584 (6th Cir. 2003).[5]

Because it was not raised in his initial petition, the claim could only be brought by way of a second or successive petition pursuant to 28 U.S.C. § 2244. However, Thompson also failed to seek the permission of this Court before raising the claim to the district court, so it is not reviewable here.[6] *See* 28 U.S.C. §§ 2244(b)(2), (3).

I realize that the Eighth Circuit, in *Singleton v. Norris*, 319 F.3d 1018, 1023 (8th Cir. 2003) (en banc), held that 28 U.S.C. § 2244(b)'s restrictions on "second or successive" petitions did not apply to a habeas petitioner's *Ford* claim and "*Ford*-derived" Eighth Amendment challenge to involuntary medication. In *Singleton*, the petitioner raised a *Ford*-competency claim in his initial and second habeas petitions. *Singleton*, 319 F.3d at 1021-22. Both times, the courts did not reach the *Ford* claim because the petitions were decided on other grounds. *Id.* Finally, in his third habeas petition, the en banc court had to decide whether the petitioner's *Ford* claim–and his *Ford*-derived chemical competency claim–were barred as second or successive habeas petitions. The court, relying in part upon *In re Cain*, 137 F.3d 234 (5th Cir. 1998), a Fifth Circuit case considering an inmate's challenge to loss of good-time credits, held that a claim that "had not arisen" at the time of a previous habeas petition was not

---

[5]Our discussion here of AEDPA's limitation on second or successive habeas petitions is distinct from the lead opinion's discussion of the applicability of AEDPA's one-year statute of limitations on federal habeas petitions. *See* Section II, B *supra*. The lead opinion's analysis is confined to consideration of whether Thompson's chemical competency claim, as found in his March 17, 2006 amended habeas petition, was raised within one year of the state court's final judgment.

[6]On June 20, 2007, this Court expanded Thompson's Certificate of Appealability ("COA") to address "whether the district court properly dismissed his claim that it is unconstitutional to execute an individual who is rendered competent through forced medication." Our decision to expand Thompson's COA does not waive AEDPA's gatekeeping provisions under 28 U.S.C. § 2244.

second or successive.  According to the en banc majority, the petitioner's chemical competency claim did not arise until he was subject to a *Harper* order of involuntary medication *and* the execution date was set.  319 F.3d at 1023.  Because the petitioner was not under a *Harper* order until *after* his initial petitions were adjudicated, the claims "had not arisen" at the time of the prior petitions and were, thus, not "second or successive."  *Id.*

One judge dissented.  Judge Loken would have concluded that Singleton's claim was ripe by the time Singleton had filed his first federal habeas petition:  "Whereas a *Ford* competency claim is fact-intensive, whether it is constitutional to execute an inmate who is competent only by reason of medical treatment–*whether voluntarily or involuntarily administered*–is an issue of law that was apparent to Singleton's attorneys no later than the May 1995 competency hearing."  *Id.* at 1028 (Loken, J., dissenting in part).  In my view, Judge Loken correctly characterizes the chemical competency claim as a question of law distinct from a fact-driven *Ford* claim.  And while certain facts are necessary to ripen the claim–namely that the prisoner is, or likely to be, under an order of involuntary medication–the chemical competency claim is not tied to the same facts relevant to a *Ford* petition–namely the imminency of an actual execution date.  *Cf. Cooey v. Strickland*, 479 F.3d 412, 418-19 (6th Cir. 2007) (holding that the statute of limitations in a § 1983 challenge to a state's lethal-injection protocol began to run upon conclusion of direct review of death sentence and not when execution date was imminent).

Thus, were the issue properly before us, the proper answer would be that Thompson's chemical competency claim presents a question of law, distinct from his fact-intensive *Ford* claim, and should have been raised in his initial habeas petition in 1998 attacking the merits of his state conviction and sentence.  Indeed, Thompson claims that the state forcibly medicated him as early as 1995.  *See Thompson*, 2006 WL 1195892, at *32 n.17.  Therefore, the factual basis for this claim undeniably existed when he first petitioned the district court for habeas relief in 1998.  And it was most certainly available in 2004 when he filed his *Ford* petition.  Because the claim was ripe

in 1998, it could and should have been raised in Thompson's initial petition or via a separate 28 U.S.C. § 2244 petition.  Since it was not, the claim should be dismissed pursuant to § 2244(b)(2).

## III.

I agree that the promulgation of Tennessee Supreme Court Rule 39 ("Rule 39") is an "extraordinary circumstance" under this Court's reasoning in *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004) (en banc) ("*Abdur'Rahman I*"), *vacated*, 545 U.S. 1151 (2005).  However, this Court should not have considered Thompson's Rule 60(b)(6) motion seeking relief from the district court's judgment based upon Rule 39 because he has failed to raise this motion within a reasonable time.  *See* FED. R. CIV. P. 60(c)(1).  The limits of reasonable time "ordinarily depend[] on the facts of a given case including the length and circumstances of the delay, the prejudice to the opposing party by reason of the delay, and the circumstances compelling equitable relief." *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365 (6th Cir. 1990); *see also Lester v. Zurn Indus., Inc.*, No. 93-3464, 33 F.3d 54, 1994 WL 421750, *1 (6th Cir. Aug. 11, 1994) ("What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and [the consideration of] prejudice [if any] to other parties.").

Thompson had many reasonable opportunities and sufficient notice to bring his Rule 60(b)(6) motion well before his eventual January 20, 2006 filing.  Rule 39 was promulgated on June 28, 2001, which provided notice to Thompson of the district court's error respecting exhaustion law in Tennessee.  At that time, Thompson was actively pursuing an appeal in this Court of the dismissal of his initial § 2254 habeas petition.  Indeed, Thompson even felt compelled to file a notice of supplemental authority referencing Rule 39 to this Court on August 1, 2001.  Thus, Thompson was aware of Rule 39 and its potential effect on his interests at least as early as August 1, 2001.  For this claim to be timely, Thompson should have been diligently pursuing his 60(b) motion in 2001, just as the petitioner in the *Abdur'Rahman* line of cases did.  *See*

*Abdur'Rahman I*, 392 F.3d at 178 (noting that Abdur'Rahman filed a Rule 60(b) motion relying upon Rule 39 on November 1, 2001, challenging the district court's refusal to consider his prosecutorial misconduct claims as procedurally defaulted).

To be sure, in 2001, Thompson's Rule 60(b) motion would have been treated as a second or successive habeas petition based upon Circuit precedent in *McQueen v. Scroggy*, 99 F.3d 1302, 1305 (6th Cir. 1996), *overruled by Abdur'Rahman I*, 392 F.3d 174, which held that Rule 60(b) motions were the "practical equivalent" of successive habeas corpus petitions.   However, it must be remembered that the diligence of Thompson's contemporary, Abdur'Rahman (who was also sentenced to death in Tennessee), who filed a Rule 60(b) motion in 2001 despite *McQueen*, was what led to the overturning of *McQueen* and cleared the path for habeas petitioners to file Rule 60(b) motions in this context without threat of defaulting.   In fact, we rejected a similar argument in *Cooey v. Strickland*, 479 F.3d at 422.   In *Cooey*, we considered a plaintiff's argument that the statute of limitations on a § 1983 claim did not begin to run until a Supreme Court decision, *Nelson v. Campbell*, 541 U.S. 637 (2004), made a § 1983 action a possible remedy, where circuit precedent explicitly precluded a death-row inmate from challenging his method of execution via § 1983.   *Cooey*, 479 F.3d at 422.   We rejected the argument, stating that "[s]o long as there remains the possibility of en banc reconsideration and Supreme Court review, circuit law does not completely foreclose all avenues of relief.'" *Cooey*, 479 F.3d at 422.

After Abdur'Rahman's successful Rule 60(b) challenge, this *en banc* Court, on December 13, 2004, overturned *McQueen*.  *See Abdur'Rahman I*, 392 F.3d at 182.   At that time, the threat of Thompson's 60(b) motion being treated as a second or successive habeas petition vanished, and he should have–at the latest–filed his motion within a "reasonable" time thereafter.   Instead, Thompson waited another 13 months, and the record and briefs provide no explanation for his delay.

The majority opinion acknowledges that Thompson could have filed his Rule 60(b) motion immediately after *Abdur'Rahman I* was published, but dismisses it as "theoretical" because Thompson's appeal was still pending and the district court would

not have had jurisidiction.  This is no excuse.  While it is true that the district court would not have had jurisdiction to hear Thompson's Rule 60(b) motion while Thompson's habeas petition was before this Court, *Pittock v. Otis Elevator Co.*, 8 F.3d 325, 327 (6th Cir. 1993) (noting that a district court did not have jurisdiction to rule on a 60(b) motion once the plaintiffs filed a notice of appeal), this Court has held that the proper procedure for seeking relief from a judgment under Rule 60(b) is to file that Rule 60(b) motion in district court even if an appeal is pending.  *See Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).  The district court would then indicate whether it would grant the motion, thus allowing the party to move this Court for a remand of the case. *Id.*  Therefore, contrary to the Court's reasoning, there was no jurisdictional hurdle for Thompson to overcome before filing his Rule 60(b) motion.

Finally, we must remember that this Court reviews the denial of a Rule 60(b) motion only for abuse of discretion and affirms the district court's ruling "unless this court is left with a 'definite and firm conviction that the trial court committed  a clear error of judgment.'" *Cincinnati Ins. Co. v. Byers*, 151 F.3d 574, 578-79 (6th Cir. 1998) (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)).  In other words, "Under the abuse of discretion standard, an appellate court may overturn a lower court's ruling only if it finds that the ruling was arbitrary, unjustifiable, or clearly unreasonable." *Plain Dealer Pub. Co. v. City of Lakewood*, 794 F.2d 1139, 1148 (6th Cir. 1986).  The district court applied the appropriate law and conducted a thorough analysis of the record.  Though the district court ultimately held that Rule 39 was not an "extraordinary circumstance" entitling Thompson to Rule 60(b)(6) relief, the district court held that denial was also appropriate because Thompson failed to raise his 60(b) motion within a reasonable time as required under Rule 60(b):

> Rule 39 was enacted on June 28, 2001, and the Sixth Circuit initially issued its opinion on or about January 13, 2003, and certiorari was denied on or about December 1, 2003.  However, on or about June 28, 2004, the Court of Appeals for the Sixth Circuit vacated its judgment and remanded the case to this Court.  The United States Supreme Court reversed the Sixth Circuit's decision on August 29, 2005, and denied Thompson's petition for rehearing on September 19, 2005.  Nevertheless, Thompson waited more than four and a half years after the enactment of

Rule 39 and four months from the denial of certiorari before filing his
Rule 60(b)(6) motion on January 20, 2006. Thompson has not provided
any explanation for the delay. Thompson's filing of his motion more
than one year after the enactment of Rule 39 demonstrates a lack of due
diligence. Such a delay, without excuse, will ordinarily result in the
denial of a Rule 60(b) motion.

*Thompson v. Bell*, No. 4:98-CV-00006, at 8 (E.D. Tenn. Mar. 27, 2006).

In reaching its ruling, the district court properly cataloged the procedural posture
of the case and implied relevant points where Thompson could have raised the motion.
Accordingly, I believe there is no way that an appellate court can fairly deem the district
court's ruling as "arbitrary, unjustifiable, or clearly unreasonable." *Plain Dealer*, 794
F.2d at 1148.

In sum, the instrument for attacking the district court's judgment was available
as early as June 28, 2001, when Rule 39 was promulgated. Thompson's filing of a
"notice" before this Court in August 2001 demonstrates that he knew about this avenue
of attacking the judgment. Finding no compelling justification to excuse Thompson's
failure to raise his motion within a reasonable time, I would hold that even though the
promulgation of Rule 39 is an "extraordinary circumstance," Thompson's delay in filing
his Rule 60(b) motion until 2006 is not reasonable, and the district court properly denied
relief on Thompson's motion.

## IV.

For the foregoing reasons, I concur in the majority's decision to remand the issue
of Thompson's present competency to be executed to the district court for an evidentiary
hearing. If the state courts find Thompson meets the *Ford* standard for competency,
then the state should be allowed to proceed forthwith with Thompson's execution.
Further, Thompson's underlying state court judgment and conviction should not be
revisited under the guise of a very untimely Rule 60(b) motion.