

# SUPREME COURT OF MISSOURI
## en banc

STATE ex rel. ANDRE COLE,     )
    )
          Petitioner,     )
    )
v.     )     No. SC94880
    )
CINDY GRIFFITH, WARDEN,     )
POTOSI CORRECTIONAL CENTER,   )
    )
          Respondent.     )

### ORIGINAL PROCEEDING IN HABEAS CORPUS

*Opinion issued April 9, 2015*

On February 25, 2015, this Court scheduled the execution of Andre Cole for April 14, 2015. On March 23, 2015, Mr. Cole filed a petition for a writ of habeas corpus, claiming that he is incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986); *Panetti v. Quarterman*, 551 U.S. 930 (2007); and section 552.060.1.[1] Mr. Cole asks this Court to issue a writ prohibiting his execution and to appoint a special master to conduct an evidentiary hearing on his claim of incompetency. He also filed a motion for a stay of execution while his incompetency claim is adjudicated. Because the evidence before this Court shows that Mr. Cole has a rational understanding of his sentence and the reason for it and that he is capable of understanding matters in extenuation, arguments for clemency, and reasons why his sentence should not be carried out, Mr. Cole is not

---

[1] All statutory references are to RSMo 2000, unless otherwise indicated.

incompetent to be executed under *Ford*, *Panetti*, or section 552.060.1. Therefore, this Court denies his habeas petition on the merits and overrules his accompanying motion for a stay of execution.

### Factual and Procedural Background

In 2001, Mr. Cole was convicted of first-degree murder, first-degree assault, first-degree burglary, and two counts of armed criminal action. Mr. Cole was sentenced to death for the murder.[2] This Court affirmed Mr. Cole's convictions on direct appeal. *State v. Cole*, 71 S.W.3d 163 (Mo. banc 2002) (*Cole I*). Mr. Cole's motion for post-conviction relief was overruled, and this Court affirmed that decision. *Cole v. State*, 152 S.W.3d 267 (Mo. banc 2004) (*Cole II*). The United States District Court for the Western District of Missouri denied Mr. Cole's federal petition for a writ of habeas corpus, *Cole v. Roper*, 579 F. Supp.2d 1246 (E.D. Mo. 2008) (*Cole III*), and the United States Court of Appeals for the Eighth Circuit affirmed that decision, *Cole v. Roper*, 623 F.3d 1183 (8th Cir. 2010) (*Cole IV*).

### A. Mr. Cole's Crimes[3]

Mr. Cole and his wife, Terri, divorced in 1995 after eleven years of marriage. Mr. Cole was ordered to pay child support for the care of the couple's two children, but his periodic failure to make payments resulted in an arrearage of nearly $3,000. The record indicates that Mr. Cole and Terri also had disputes involving visitation with the children,

---

[2] He was also sentenced to three terms of life imprisonment for assault and two counts of armed criminal action and a thirty-year term of imprisonment for burglary.
[3] The recital of Mr. Cole's crimes is taken from the opinion of the Eighth Circuit in *Cole IV* without further attribution. 623 F.3d at 1186.

and in August 1998, Mr. Cole was upset about his alleged lack of visitation with his two sons. There is also evidence he was upset about his wages being garnished to cover the child support arrearage. On the evening of August 21, 1998, Mr. Cole forced his way into Terri's house by throwing a tire iron through a glass door leading to the dining room from the patio. Anthony Curtis, who was visiting Terri, confronted Mr. Cole and asked him to leave. Mr. Cole stabbed and slashed Mr. Curtis more than twenty times, the fatal blow being an eight-inch deep knife wound to Mr. Curtis's back. Mr. Cole then assaulted Terri, stabbing her repeatedly in the stomach, breasts, back, arms, and her hands when she attempted to defend herself. Terri survived and testified at trial. After the attack, Mr. Cole fled the state, but after a little over a month, returned to St. Louis and surrendered to the police. DNA analysis confirmed the presence of both victims' blood on the knife and the presence of Mr. Cole's blood on the deck of Terri's home, the backyard fence, and in the street where Mr. Cole's car had been parked.

### B. Mr. Cole's Trial

Prior to his trial, Mr. Cole's counsel requested an evaluation of Mr. Cole's competency to stand trial under section 552.020 and to determine whether Mr. Cole was not criminally liable by reason of a mental disease or defect under section 552.030. The trial court appointed Dr. Richard Scott to evaluate Mr. Cole to determine his competency to stand trial. Dr. Scott opined that Mr. Cole was not suffering from a mental disease or defect at that time and that he was capable of understanding the proceedings against him and assisting in his own defense. Dr. Michael Armour, who was retained by Mr. Cole's trial counsel, also evaluated Mr. Cole. Dr. Armour concluded that Mr. Cole was not

3

suffering a mental disease or defect at the time of the murder that would have precluded him from knowing and appreciating the nature, quality, and wrongfulness of his conduct. In their reports, Dr. Armour and Dr. Scott both noted that Mr. Cole denied symptoms of depression, paranoia, delusions, and hallucinations, and they specifically eliminated depression as a possible diagnosis for Mr. Cole.

During the guilt phase of trial, Mr. Cole did not raise the issue of mental illness as a defense or claim that he was incompetent to stand trial. Instead, Mr. Cole presented the theory that he did not bring a weapon into Terri Cole's house and that Mr. Curtis initiated the attack with a knife. He further testified that he did not have a knife in his hand that night. Mr. Cole did not raise an issue with his mental health during the penalty phase.

### C. Mr. Cole's Post-Conviction Proceedings

In his post-conviction relief proceedings, Mr. Cole asserted that trial counsel was ineffective for failing to present expert witness testimony during the penalty phase to support a claim that Mr. Cole was under extreme mental or emotional disturbance at the time of the crime. In support of this claim, Mr. Cole relied on the report and testimony of Dr. William Logan, a forensic psychiatrist. Dr. Logan's report stated that Mr. Cole was suffering from major depression at the time of the offense and that his depression, along with alcohol intoxication and the use of steroids, impaired his ability to rationally deliberate and use reasoned judgment at the time of the offense. At the evidentiary hearing on Mr. Cole's post-conviction relief motion, Dr. Logan admitted that Mr. Cole had lied in the case and that Dr. Logan could not always tell when Mr. Cole was lying.

4

In denying his claim of ineffective assistance of counsel, the motion court found Dr. Logan to not be a credible witness, stating:

> The Court, having heard and considered all of Dr. Logan's testimony finds his opinions to lack the necessary evidence required to support his conclusions. Dr. Logan admitted that he based his opinions on [Mr. Cole's] testimony as well as interviews with [Mr. Cole's family and friends]. Dr. Logan confessed that his entire source of materials for his testimony were litigation materials chosen and provided to him by [Mr. Cole's] counsel. Clearly, this testimony was biased towards the particular conclusion [Mr. Cole's] counsel desired to reach. Dr. Logan conceded that many of the claims made by [Mr. Cole] in his interview were distorted, minimized, inconsistent and probably untrue. He agreed that [Mr. Cole's] current version of events differed greatly from his trial testimony and previous statements to Drs. Scott and Armour. Dr. Logan admitted that [Mr. Cole], his family and friends have incentive not to speak honestly about his participation in these crimes. He conceded that his report did not have balance by including any interviews with the victim, Terri Cole or her family of their description of the marital discord. Dr. Logan's testimony was rife with biased hearsay, inconsistent theories and was substantially discredited through cross-examination.

The motion court further stated, "[Dr. Logan's] testimony and status as an expert witness is rejected by this Court."

The court ultimately found that trial counsel was not ineffective for not presenting expert testimony that Mr. Cole was under extreme mental or emotional distress at the time of the murder. In addition to the two pre-trial reports that did not find Mr. Cole suffered from a mental disease or defect, trial counsel interviewed 25 individuals identified to her by Mr. Cole and his family, and none of the witnesses reported any mental health issues with Mr. Cole or his family. *See Cole II*, 152 S.W.3d at 270. Further, the motion court found that arguing Mr. Cole was acting under extreme emotional or mental distress would have been inconsistent with Mr. Cole's trial

testimony in which he denied involvement in the murder and stated that Mr. Curtis was the initial aggressor. On appeal, this Court affirmed the motion court's judgment, finding that Mr. Cole did not receive ineffective assistance of counsel. *Id.* at 269-70.

### D. Mr. Cole's Federal Habeas Proceedings

In his federal habeas writ petition, Mr. Cole raised again his claim of ineffective assistance of counsel based on counsel's failure to present expert testimony that he was acting under extreme mental or emotional distress at the time of the murder. *Cole III*, 579 F. Supp.2d at 1276. Mr. Cole again relied on Dr. Logan's 2002 report in which Dr. Logan opined that Mr. Cole suffered from depression at the time of murder. *Id.* The district court found trial counsel was not ineffective for not pursuing an emotional distress argument when two pretrial mental health evaluations, interviews of 25 lay witnesses, and Mr. Cole's own statements to counsel did not reveal that Mr. Cole was suffering from any mental illness. *Id.* at 1277-80. On appeal, the Eighth Circuit held the district court did not err in rejecting Mr. Cole's ineffective assistance of counsel claim. *Cole IV*, 623 F.3d at 1190.

### Mr. Cole's Present Incompetency Claim

Mr. Cole now claims he is not competent to be executed. He petitions this Court for a writ of habeas corpus prohibiting his execution and an order appointing a special master to conduct an evidentiary hearing to adjudicate his claim of incompetency. He also moves this Court to stay his execution on the ground that the procedures for appointing a special master and holding a hearing cannot reasonably be accomplished before his scheduled execution.

6

In support of his present claim of incompetency, Mr. Cole filed affidavits from his attorneys, Joseph Luby and Carol Camp. Mr. Luby has represented Mr. Cole since 2001 and states that he has noticed deterioration in Mr. Cole's mental condition over the last four years. According to Mr. Luby, beginning in 2011, conversations with Mr. Cole have become more difficult in that Mr. Cole jumps from topic to topic, speaks quickly and with agitation, and has become paranoid. Ms. Camp began representing Mr. Cole in October 2014 and states that she has noticed a significant and consistent deterioration in Mr. Cole's mental condition since that time.

Mr. Luby's and Ms. Camp's affidavits report five conversations – either over the telephone or in person – with Mr. Cole between October 23, 2014, and March 20, 2015. According to the affidavits, Mr. Cole told his attorneys during these conversations that he had been hearing voices and that he believed the state had been trying to communicate with him through the television, intercom system, and prison staff and inmates. The voices would make racist and harassing comments and tell Mr. Cole that the state was trying to get him. When asked by his attorneys whether the comments were coming from other prisoners or something supernatural, Mr. Cole initially stated that he did not know but later stated that the harassment was mostly from other prisoners. Mr. Cole's attorneys also report that Mr. Cole appeared to have trouble communicating during these conversations; he had trouble following a train of thought for more than short periods of time and would change from normal speech to whispering or mouthing words mid-sentence.

In addition to his attorneys' affidavits, Mr. Cole filed a recent report from Dr. Logan, the psychiatrist who testified at Mr. Cole's post-conviction motion hearing. Dr. Logan's report is based on a 2.5 hour examination of Mr. Cole that occurred on February 20, 2015, the report from his previous examination of Mr. Cole in 2002,[4] Mr. Cole's medical records from the department of corrections, memoranda from Mr. Cole's attorneys regarding their interactions with him, and a memorandum describing his attorneys' meeting with Mark Williamson, Mr. Cole's cellmate in early 2015. Dr. Logan states that this information showed Mr. Cole's mental state had deteriorated and that Mr. Cole has become withdrawn, has been reported as talking to someone when he is alone, is secretive, and exhibits odd behaviors such as turning on the television to drown out voices. Dr. Logan also notes the reports that Mr. Cole has been hearing voices discussing issues relating to his legal case, disability, and family and financial issues.

Dr. Logan states that, during the examination, Mr. Cole was able to recall the historical elements of his case. Dr. Logan also reports that, as the interview progressed, Mr. Cole's thinking became more disorganized and would digress to talking about his emotional state. Mr. Cole reported feeling depressed, overwhelmed, and distracted by the voices. He told Dr. Logan that he believed the voices are supernatural. Regarding the voices, Mr. Cole told Dr. Logan many of the things about the voices that he told his attorneys, including that he thinks the voices are trying to scare him with the death

---

[4] When he prepared his 2002 report, Dr. Logan considered the opinion of Dr. Michael Stacy, who performed a psychological evaluation of Mr. Cole around that time.

penalty and that the state wants to execute him to "take [him] down." Using language

from section 552.060.1, Dr. Logan concluded:

> Mr. Cole is depressed with prominent symptoms of psychosis which adversely affect his comprehension and understanding to the extent that his mental disease causes him to lack the capacity to understand the nature and purpose of the punishment about to be imposed upon him or matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out. Mr. Cole's hallucinations have compromised his understanding to the point he has gross delusions which prevent him from comprehending or forming a rational understanding of the reason for the execution to which he has been sentenced.

The state filed a response opposing Mr. Cole's writ petition and submitted

exhibits, including the department of correction's mental health records of Mr. Cole and

audio recordings and transcripts from telephone calls with Mr. Cole.[5] The first

conversation occurred on September 12, 2014, between Mr. Cole and a woman and was

seven minutes long.[6] Mr. Cole asked the woman if she had read any articles about a

recent issue that had come up with a man who was executed and stated that he had read

something stating there was an issue with George Lombardi lying about the protocol.[7]

The September 26, 2014, conversation was also with a woman and lasted thirteen

minutes. During the conversation, Mr. Cole brought up a woman in Texas who was

executed. Mr. Cole had been doing research on the woman and expressed that he did not

think it made sense that the woman received the death penalty when another woman who

---

[5] The state also filed the reports from the psychiatrists who evaluated Mr. Cole prior to trial and grievances Mr. Cole filed with the department of corrections.

[6] References to Mr. Cole's father as "dad" and "your daddy" and the female's reference to Mr. Cole and his sister suggest that the female is Mr. Cole's mother.

[7] The female later identified the man as "Ringo," likely referring to Earl Ringo, Jr., whose death sentence was carried out on September 10, 2014.

had participated in the murder did not. Mr. Cole also expressed an opinion that there should be a standard death penalty procedure among the states.

The sixteen-minute conversation from March 1, 2015, is between Mr. Cole and a man. Mr. Cole explained that he was in "pre-execution status," which meant that he would be moved to a different facility soon and that his visitation procedure had changed. During much of the conversation, Mr. Cole and the man discussed how Mr. Cole needed to keep faith in God. Mr. Cole also stated that he had called his mother to see how she had been holding up with the circumstances.

The conversation on March 9, 2015, was between Mr. Cole and a woman and lasted 50 minutes.[8] The woman told Mr. Cole that she was praying for a miracle and repeatedly assured Mr. Cole that God was there for him. During the conversation, the woman told Mr. Cole about a recent Georgia execution that was stayed due to inclement weather and an issue with the execution drugs. Mr. Cole then discussed questions that have been raised about execution drugs, including questions regarding the drugs' compositions, how the drugs are being used, whether the drugs are "clean," and whether there has been sufficient testing on the drugs. Mr. Cole later mentioned problems he perceived in his trial, including: (1) a racial bias against him; (2) that the prosecutor's story that he stabbed a man to death while he also had a gun did not make sense; (3) and that the alleged motives for the crimes – Mr. Cole was jealous of Mr. Curtis and Mr. Cole could not pay child support – were not true. Additionally, in response to the woman

---

[8] The woman is likely Mr. Cole's sister because she refers to Mr. Cole as "brother."

asking Mr. Cole if he could take medication to help calm him, Mr. Cole indicates that he had been told not to see the prison's psychiatrist.

The last conversation occurred on March 24, 2015, and lasted only two and half minutes. Mr. Cole called Ms. Camp to let her know that Dr. Alwyn Whitehead, who works for the department of corrections, had visited him but that he did not say anything to him. Ms. Camp reminded Mr. Cole that the telephone call was being recorded and suggested setting up a telephone call to talk further.

Mr. Cole filed a reply to the state's response, submitting a letter from Dr. Logan stating that he had reviewed the state's exhibits and that the exhibits did not change his opinion regarding Mr. Cole's competency. Mr. Cole also filed a report prepared in 2002 from Dr. Michael Stacy, a psychologist who examined Mr. Cole. In the report, Dr. Stacy had diagnosed Mr. Cole with major depressive disorder, recurrent, moderate.

Mr. Cole also filed a signed statement from Jessica Sutton, who represented Mr. Cole from 2012 to October 2014. Like Mr. Cole's current attorneys, Ms. Sutton stated she noticed a marked deterioration of Mr. Cole's mental health during her representation of him. According to Ms. Sutton, Mr. Cole used to be active in the prison community, but by the end of Ms. Sutton's representation of Mr. Cole, he had minimal interaction with other prisoners. Ms. Sutton states that Mr. Cole was particularly distressed during her last meeting with him on October 4, 2014, and he reported hearing voices at night.

11

She also found Mr. Cole had trouble communicating and was in an agitated state during that visit.[9]

### Failure to Show Incompetency

Mr. Cole petitions this Court for a writ of habeas corpus on the ground that he is incompetent to be executed. A petition for a writ of habeas corpus is a proper means to raise a claim of incompetency. *State ex rel. Middleton v. Terry Russell*, 435 S.W.3d 83, 83 (Mo. banc 2014). In his petition, Mr. Cole raises two claims of incompetency: (1) he is incompetent under the standards established by the United States Supreme Court in *Ford* and *Panetti* because he suffers a mental disease or defect that prevents him from rationally understanding his death sentence; and (2) he is incompetent under section 552.060.1 because his mental disease or defect also prevents him from understanding matters in extenuation, arguments for executive clemency, or reasons why his sentence should not be carried out.

### A. *Ford* and *Panetti*

The Eighth Amendment's prohibition against cruel and unusual punishment prevents a state "from inflicting the penalty of death upon a prisoner who is insane." *Ford*, 477 U.S. at 410. This Court applies the standard set out in *Ford* and *Panetti* for an Eighth Amendment claim that a prisoner is not competent to be executed. *See State ex rel. Clayton v. Griffith*, __ S.W.3d__ Slip Op. at 15 (SC94841) (Mo. banc March 14,

---

[9] Ms. Sutton's written statement states that she could not provide an affidavit because she is currently traveling abroad. Mr. Cole provided an affidavit from Ms. Sutton's former co-worker who accompanied Ms. Sutton to the prison on October 4, 2014, and who remembers Ms. Sutton describing Mr. Cole's bizarre behavior during the visit.

2015). A state may not execute a prisoner "'whose mental illness prevents him from comprehending the reasons for the penalty or its implications" or is "unaware of the punishment they are about to suffer and why they are to suffer it.'" *Panetti*, 551 U.S. at 957, citing *Ford*, 477 U.S. at 417, 422. In *Panetti*, the United States Supreme Court held that a prisoner is not competent to be executed where the prisoner's "mental illness . . . is the source of gross delusions preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced." 551 U.S. at 960. The Supreme Court emphasized that the delusions must "impair the prisoner's concept of reality [so] that he cannot reach a rational understanding of the reason for the execution." *Id.* at 958.

"Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition." *Id.* at 934. However, the state may presume that a prisoner who has been judged competent to stand trial remains sane at the time sentence is to be carried out and "require a substantial threshold showing of insanity" to trigger further proceedings. *Ford*, 477 U.S. at 426; *see also Middleton*, 435 S.W.3d at 84.

The Supreme Court has not clarified the "substantial threshold showing of insanity." Mr. Cole points to other jurisdictions articulating a standard and argues that if a prisoner's evidence meets the threshold when considered alone, he is entitled to an evidentiary hearing. Unlike some of the cases on which Mr. Cole relies,[10] however,

---

[10] *See Provenzano v. State*, 751 So.2d 37 (Fla. 1999) (applying Florida Rule of Criminal Procedure 3.821); *Druery v. State*, 412 S.W.3d 523 (Tex. Crim. App. 2013) (applying

13

Missouri does not have a statutory procedure for adjudicating claims of incompetency to be executed raised before this Court. Therefore, this Court is guided by *Panetti*.

In *Panetti*, the prisoner had a well-documented history of mental illness at the time of his crimes that included delusions and hallucinations. 551 U.S. at 936. During trial, the prisoner's trial counsel described his behavior during trial as "bizarre," "scary," and "trance-like," and the record demonstrated that his mental condition only worsened after trial. *Id.* at 936-37. After the prisoner claimed he was incompetent to be executed, the state court ordered two court-appointed medical experts to examine the prisoner. *Id.* at 938-39. The court relied on opinions of the court-appointed experts, who concluded the prisoner was competent to be executed. The Court denied the prisoner's claim without addressing the prisoner's objections to the experts' reports or his request for funds to hire his own mental health expert. *Id.* at 940-41. The Supreme Court found the state court proceedings not only departed from the state's own statutory proceedings but were contrary to *Ford*. *Id.* at 948.

In articulating the due process protections required by *Ford*, the Supreme Court stated:

> Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. This protection means a prisoner must be accorded an "opportunity to be heard," though "a constitutionally acceptable procedure may be far less formal than a trial." As an example of why the state procedures on review in *Ford* were deficient, Justice Powell explained, the determination of sanity "appear[ed] to have been made solely on the basis of the examinations performed by

Article 46.05); and *Timberlake v. State*, 858 N.E.2d 625 (Ind. 2006) (applying Indiana Post-Conviction Relief Rule 1, section 12(b)).

14

state-appointed psychiatrists." "Such a procedure invites arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even from explaining the inadequacies of the State's examinations."

*Id.* at 949 (internal citations omitted) (quoting and citing *Ford*, 477 U.S. at 424, 427).

Neither *Ford* nor *Panetti* states that a prisoner is entitled to an evidentiary hearing to determine competency to be executed. Rather, *Ford* and *Panetti* hold that due process requires that a prisoner who makes a substantial showing of incompetency be provided an opportunity to be heard, which includes submission of "evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own expert psychiatric examination." *Ford*, 477 U.S. at 424, 427; *see also Panetti*, 551 U.S. at 949-50. In both *Ford* and *Panetti*, the state court proceedings were driven and controlled by the state without providing the prisoner an opportunity be heard. *Ford*, 477 U.S. at 403-04; *Panetti*, 551 U.S. at 936-41.

Unlike in *Panetti*, Mr. Cole has not been deprived of an opportunity to be heard. Mr. Cole initiated this proceeding by filing his writ petition in which he submitted his counsel's argument and his own evidence, including expert psychiatric evidence. Mr. Cole had the further opportunity to respond to the state's evidence with his counsel's argument and evidence. Because his petition for a writ of habeas corpus is an original proceeding in this Court, pursuant to Rules 84.22 and 91.01, this Court is the fact-finder.[11] In this role, the Court considers Mr. Cole's argument and evidence in ruling on

---

[11] While the Court may appoint a special master pursuant to Rule 68.03 when the circumstances of a case require further fact finding, the circumstances of this case do not so require.

15

his writ petition. Accordingly, even assuming Mr. Cole's evidence makes a substantial showing of incompetency, he has received all process to which he is entitled under *Ford* and *Panetti*.

The Supreme Court in *Panetti* expressly declined to consider "whether other procedures, such as the opportunity for discovery or for the cross-examination of witnesses, would *in some cases* be required." 551 U.S. at 952 (emphasis added). This Court also need not consider this question because it finds that Mr. Cole's evidence lacks credibility, particularly when viewed in light of the state's evidence, to make a sufficient showing of incompetency such that this Court would require additional protections.

In support of his incompetency claim, Mr. Cole relies on Dr. Logan's report and on his attorneys' affidavits. Dr. Logan concluded that Mr. Cole is suffering from depression with symptoms of psychosis, specifically "gross delusions that prevent Mr. Cole from comprehending or forming a rational understanding of the reason for the execution to which he has been sentenced." Dr. Logan did not attempt to specifically connect his conclusions with the behavior described in his report, but presumably, the gross delusions to which Dr. Logan referred were the voices that are described in more detail in Mr. Cole's attorneys' affidavits.

According to the affidavits, these alleged voices tell Mr. Cole that the state wants to execute Mr. Cole to "take him down," that state officials will have him killed by shanks or pencils if he does not change his behavior, that the state is using the threat of execution to scare him, and that he will be released from prison after which he should receive money from the state and will live with his mother. In their affidavits, however,

16

the attorneys do not express their opinions about Mr. Cole's ability to understand his sentence and the reason for it.

Neither the affidavits nor Dr. Logan's report explain what exactly is Mr. Cole's understanding of his scheduled execution or the reason to which he has been sentenced to death. By concluding the delusions prevent Mr. Cole from forming a rational understanding of the reason for execution, Dr. Logan may have found that Mr. Cole believed what the voices were saying with respect to his sentence. However, Dr. Logan did not include such a finding in his report.

This Court is cautious of accepting Dr. Logan's conclusion. The circuit court presiding over Mr. Cole's post-conviction proceedings found Dr. Logan was not a credible expert and did not believe his report or testimony regarding Mr. Cole's mental state at the time of the offense. Additionally, Dr. Logan's reports were relied on by prisoners alleging incompetency precluding execution in *Middleton* and *Clayton*. Both times, this Court found flaws in Dr. Logan's reports and was not persuaded by his opinions that the prisoners were incompetent. *Clayton*, Slip Op. at 23-25; *Middleton*, 435 S.W.3d at 84-85. Considering Dr. Logan's lack of credibility in previous proceedings in Mr. Cole's case and other cases before this Court, this Court does not give much weight to Dr. Logan's conclusion that Mr. Cole suffers gross delusions preventing him from

17

rationally understanding the reason for his sentence when Dr. Logan fails to identify or explain Mr. Cole's understanding of his sentence.[12]

Further, Dr. Logan concluded Mr. Cole's delusions were a result of his depression. Unlike in *Panetti*, Mr. Cole does not have a credible, documented history of mental illness. There are no records of hospitalization for a mental illness, and Mr. Cole has previously denied having symptoms of depression or having delusions. Despite interviewing 25 of Mr. Cole's family members and friends in preparation for trial, Mr. Cole's trial counsel found no history of mental illness. Neither Dr. Scott nor Dr. Armour, who examined Mr. Cole before trial, found he was suffering from any serious mental disease disorder other than alcoholism. The earliest observation of the alleged "gross delusions" that Mr. Cole now suffers was in October 2014. While Mr. Cole's statements to Ms. Sutton predate this Court's order, dated October 22, 2014, to show cause why an execution date should not be set, Mr. Cole's reports of hearing voices began at a time when the immediacy of his execution was becoming a reality.[13] Though a prior finding of competency does not preclude a finding of incompetency under *Ford* and *Panetti*, it is probative that Mr. Cole's claim of a mental illness that causes gross delusions is not supported by a credible history of mental illness and became apparent only when Mr. Cole's execution was nearing.

---

[12] In an effort to boost Dr. Logan's credibility, Mr. Cole argues that Dr. Logan has also testified for the prosecution, citing an online newspaper article about one Kansas case in which Dr. Logan testified for the prosecution.

[13] During the telephone conversation on September 26, 2014, Mr. Cole discussed an execution in Texas, and then made comments that suggested that he was anticipating and preparing for his execution date to be scheduled.

Most important, a review of the audio recordings of Mr. Cole's telephone conversations undermines his claims that his mental state has deteriorated or that he is suffering from delusions preventing him from rationally understanding his sentence. Instead, the recordings reveal that he has a rational understanding of his execution, including the reason for it. On March 1, 2015, Mr. Cole explained to the male caller that he was on "pre-execution status." He also expressed concern about his mother:

> And I've really just really been just trying to see how she's been holding up and how she's been doing, you know, with the circumstances more than anything. I really haven't been trying to bother her, just wanted to, you know, just keep her – keep her, you know, aware and everything else; and as well as that just to assure her, you know, that I – I'm praying and keeping myself, you know – I'm staying on the Lord, you know, night and day . . ..

Considering the context of the rest of the conversation, the "circumstances" to which Mr. Cole was referring was his execution date being set.

During the conversations from September 26, 2014, March 1, 2015, and March 9, 2015, Mr. Cole made several references to placing his trust in God and praying for a miracle. On March 9, after discussing a stayed execution in Georgia, problems with the drugs used for executions, and the issues with his murder trial, Mr. Cole and the female caller talked about Mr. Cole remaining faithful to God. Mr. Cole stated:

> I'm praying, you know, that this thing will turn around like you said and everything else. And I'm hoping, you know, maybe there will be some results possibly soon or, you know. I don't know, you know, how, how, how it will come about. I really don't. Like you said, He has His own time and everything else and I'm hoping to be --.

He later stated:

There is no doubt that I believe He can walk me through this whole situation, walk me right up out of here and everything else. No doubt. You know, I, I don't even question that. Not any bit.[14]

If Mr. Cole believes the alleged voices telling him that he would be released and that state officials, like Prosecutor McCulloch, have authority to release him, Mr. Cole would not be so resolute in trusting that God will help him.

Not only do Mr. Cole's conversations regarding his faith raise questions about the authenticity of the alleged delusions but they also show he understands his execution. In *Ford*, the Supreme Court noted that a basic principle of civilized societies is that one is not put to death "who has no capacity to come to grips with his own conscience or deity." 477 U.S. at 409. Mr. Cole has demonstrated, however, that he is capable of coming to grips with his own deity.

Additionally, the persuasiveness of the attorneys' affidavits and Dr. Logan's report with respect to Mr. Cole's behavior is significantly weakened by the audio recordings from the telephone conversations. In their affidavits, the attorneys state that Mr. Cole appeared agitated, talked for long periods of time before suddenly stopping during a sentence, sometimes whispered or mouthed words, and jumped from topic to topic in a disorganized fashion. Dr. Logan also reported that Mr. Cole's thinking became disorganized during the examination. Mr. Cole does not exhibit any of these bizarre speech behaviors during the telephone conversations, however. Rather, Mr. Cole sounds

---

[14] Mr. Cole does not argue that he is incompetent to be executed due to a delusional belief that he will not be executed because of divine intervention. But to the extent that Mr. Cole's statement here could be construed as belief that God will intervene to stop his execution, this Court has already held that such beliefs do not constitute incompetency under *Ford*. *Clayton*, Slip Op. at 18.

calm and is able to follow the conversations without abruptly changing the conversation to an unrelated topic.

This Court's finding that Mr. Cole has a rational understanding of his sentence is further supported by the department of correction's records from February 25, 2015. Mr. Cole was seen for the reading of his execution warrant. Mr. Cole declined talking to a mental health professional "because his lawyer had advised him not to," but Dr. Whitehead noted his observations of Mr. Cole. Dr. Whitehead reported that Mr. Cole "appeared to be shocked and agitated over the news of his execution" and that "[a]t times he appeared to close [sic] to tears" and "visibly shaken." This reaction, as well as comments in his telephone conversation, shows that Mr. Cole rationally understands his execution is scheduled.

Further, this Court finds Mr. Cole does not lack a rational understanding of the reason for his sentence. According to the alleged voices, Mr. Cole is going to be executed because the state wants to "take him down." As already discussed, Mr. Cole's understanding of his execution, as demonstrated by recent telephone conversations and medical records, seriously undermines the authenticity of these voices. Further, the conversation on March 9, 2015, shows that Mr. Cole understands he was convicted of murder because he talks about the murder case. Immediately after discussing problems with the execution protocol, Mr. Cole explains how he believes there was a racial motive behind what happened to him, and then Mr. Cole and the caller discuss what they believe were inconstancies or lies in the prosecutor's version of the murder. The conversation

21

demonstrates that Mr. Cole understands he was convicted for murder and that his sentence is a result of the conviction.

Any such delusions that Mr. Cole may be suffering do not so impair his concept of reality that he cannot reach a rational understanding of his sentence and the reason for it. Therefore, he is not entitled to a declaration of incompetency or an evidentiary hearing under *Ford* and *Panetti*.

### B. Incompetency under Section 552.060.1

Mr. Cole also claims that he is incompetent to be executed under section 552.060.1. Section 552.060.1 provides:

> No person condemned to death shall be executed if as a result of mental disease or defect he lacks capacity to understand the nature and purpose of the punishment about to be imposed upon him or matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out.

This Court has already found Mr. Cole understands the nature and purpose of his sentence. Dr. Logan opined that Mr. Cole suffers from a mental disease that also "causes him to lack the capacity to understand . . . matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out." Mr. Cole's attorneys also question whether Mr. Cole could understand the clemency process.

Once again, however, neither Dr. Logan nor his attorneys specifically explain how Mr. Cole is unable to understand matters in extenuation, arguments for clemency, or reasons why the sentence should not be carried out. During his post-conviction motion proceedings, Mr. Cole's trial counsel testified that Mr. Cole was "very intelligent, articulate" and that the two of them "could talk about ideas, about the law, and it seemed

to [trial counsel] that [Mr. Cole] understood." Through his attorneys' affidavits and Dr. Logan's report, Mr. Cole claims that he has experienced deterioration in his mental condition since his trial. As previously discussed, this Court does not find Dr. Logan's report to be credible and questions the genuineness of Mr. Cole's self-reported delusions and the behavior described in the affidavits.

Instead, though Mr. Cole does not specifically discuss clemency or extenuation, Mr. Cole's telephone conversations demonstrate that he is able to understand and articulate legal issues with this case. Mr. Cole discussed problems with the execution drugs, including claims that drugs used are "unclean," not sufficiently tested, and violate the Food and Drug Administration Act. These arguments regarding the drugs mirror the claims Mr. Cole raised in response to the order to show cause why the Court should not set an execution date. Mr. Cole was also able to explain the facts of his case during the March 9th conversation, and Dr. Logan found Mr. Cole was able to discuss the historical facts of his case during his examination. Mr. Cole's ability to understand his case and some of the legal issues that have been raised undercut his claim that he lacks capacity to understand arguments for extenuation or clemency. Considering the evidence Mr. Cole submitted in light of evidence submitted by the state, Mr. Cole does not show that Mr. Cole is incapable of understanding matters in extenuation, arguments for clemency, or reasons why his sentence should not be carried out as required by section 552.060.1.[15]

---

[15] As previously discussed, this Court is not limited by *Ford* or *Panetti* to considering only a prisoner's evidence for determination of whether a prisoner made a threshold showing of insanity. Similarly, section 552.060 does not limit this Court's ability to consider all the evidence before it when a prisoner raises a claim under the statute.

## Conclusion

Even assuming Mr. Cole made a substantial threshold showing of insanity, he is not entitled to any further process under *Ford* and *Panetti* because he has been afforded the opportunity to submit argument and evidence, including expert psychiatric evidence, and to reply to the evidence submitted by the state. The evidence submitted by Mr. Cole and the state show that he rationally understands his sentence and the reason for it and that he is capable of understanding matters in extenuation, arguments for clemency, and reasons why his sentence should not be carried out as required by section 552.060.1. Therefore, this Court denies Mr. Cole's petition for a writ of habeas corpus on the merits and overrules his accompanying motion for a stay of execution as moot.

_____
PATRICIA BRECKENRIDGE, JUDGE

Russell, C.J., Fischer and Wilson, JJ.,
concur; Stith, J., dissents in separate
opinion filed; Draper and Teitelman,
JJ., concur in opinion of Stith, J.

24



# SUPREME COURT OF MISSOURI
## en banc

STATE ex rel. ANDRE COLE, )
          )
      Petitioner, )
          )
v.           )   No. SC94880
          )
CINDY GRIFFITH, WARDEN, )
POTOSI CORRECTIONAL CENTER, )
          )
      Respondent. )

### DISSENTING OPINION

## I.   INTRODUCTION

Andre Cole petitions this Court under *Panetti v. Quarterman, 551 U.S. 930 (2007),* and *Ford v. Wainwright, 477 U.S. 399 (1986)*, claiming that he has made a threshold showing that his execution would violate the Eighth Amendment of the United States Constitution because he is insufficiently competent to have a rational understanding of why he is being executed. The majority agrees that, once such a threshold showing is made, *Ford* and *Panetti* entitle Mr. Cole to a hearing on the issue of whether he is competent to be executed. But the majority incorrectly determines that the hearing to which he is entitled need not be an evidentiary one or even be in the form of a hearing at all. Rather, the majority concludes it simply can take the evidence Mr. Cole presents to this Court to support his threshold showing and use that evidence to make credibility determinations as to whom to believe and whose reports are entitled to more

weight in the first instance and then itself decide the ultimate factual issue of whether Mr. Cole is incompetent.

The majority opinion cites to no authority to support its conflation of the threshold showing and hearing stages of the *Panetti* analysis or for substituting this Court for a fact-finder on issues of credibility, and there is none. While *Panetti* held that the hearing need not have the formality of a trial, it reaffirmed that a "fair hearing" must follow a threshold showing. The weight of authority of cases addressing that issue interprets this as an evidentiary hearing. The majority does not cite any authority that states that an appellate court can consider the credibility of the threshold evidentiary showing and resolve factual disputes in lieu of having a hearing, as this Court now does. The majority is in error in all of these regards.

For these reasons, I dissent. Because Mr. Cole has made a threshold showing of incompetence, this Court should stay Mr. Cole's execution and appoint a special master who can conduct what *Ford* describes as a "fair hearing" to determine whether Mr. Cole's current mental capacity bars his execution.

## II.    ANALYSIS

In *Ford* and *Panetti*, the United States Supreme Court set out the standard for granting a stay of execution in the face of a claim of incompetence. Such a claim does not second-guess the decision that the defendant was competent to be tried, nor does it attack his conviction. *Panetti, 551 U.S. at 934*. Rather, it assumes the validity of his conviction and addresses only whether mental health, medical, and other factors occurring since the conviction have rendered him incompetent to be executed because, as

2

the plurality in *Ford* explained, "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford, 477 U.S. at 409-10*.

*Ford* was a plurality decision. *Panetti* recognized that Justice Powell's concurring opinion, being the narrowest one, is controlling. *Panetti, 551 U.S. at 949*. In his concurring opinion in *Ford*, Justice Powell agrees that one cannot execute prisoners "who are unaware of the punishment they are about to suffer and why they are to suffer it." *Ford, 477 U.S. at 422*. *Panetti* clarified, however, that an understanding of "why they are to suffer" execution requires more than a showing that the defendant knows that the State wishes to execute him for a murder. Rather, it requires a rational understanding of why this is a proper punishment for his crime. As *Panetti* explained:

> Whether *Ford's* inquiry into competency is formulated as a question of the prisoner's ability to "comprehend[d] the reasons" for his punishment or as a determination into whether he is "unaware of … why [he is] to suffer it," then, the approach taken by the Court of Appeals is inconsistent with *Ford*. The principles set forth in *Ford* are put at risk by a rule that deems delusions relevant only with respect to the State's announced reason for a punishment or the fact of an imminent execution, see 448 F.3d, at 819, 821, as opposed to the real interests the State seeks to vindicate. … A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it. *Ford* does not foreclose inquiry into the latter.

*Panetti, 551 U.S. at 959*.

How does a court determine whether the defendant has this kind of understanding? The majority opinion in the instant case says that it is not sure, for no exact standard is set by *Ford* or *Panetti*. But that does not mean these cases do not provide some guidance on this issue. Both are clear that there is a two-part test – first, a court must determine whether a substantial threshold showing has been made of incompetence. *Id. at 949*. And, as *Panetti* made clear, once that is done, then there must be a second procedural

3

step, a "fair hearing" at which the prisoner can support his claim with further evidence:

> Once a prisoner seeking a stay of execution has made a "*substantial threshold showing of insanity*," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. *Ford,* 477 U.S., at 426, 428. … This protection means a prisoner must be accorded an "opportunity to be heard" … though a "constitutionally acceptable procedure may be far less formal than a trial."

*Id.* (emphasis added) (internal citations to Justice Powell's *Ford* concurrence omitted).

The United States Supreme Court thereby requires that (1) there must be consideration of whether there is a threshold showing, and if so, that (2) there must be a fair hearing.

In *Panetti,* neither procedural requirement was properly met, for the state court failed to consider any submissions from the defendant. The state court considered only the state's evidence in the form of psychiatric opinions that the defendant was competent. This failed to meet the most minimum requirements for due process, which *Panetti* said must include at least "the opportunity to make an adequate response to evidence solicited by the state court" and in a case involving experts, "an opportunity to submit psychiatric evidence as a counterweight to the report filed by the court-appointed experts." *Id. at 952.* Because the state court's failure to consider any submissions from the defendant was clearly inadequate, *Panetti* said it did not need to go on and address "whether other procedures, such as the opportunity for discovery or for the cross-examination of witnesses, would in some cases be required under the Due Process Clause" because what was shown already violated due process. *Id.*

But the majority is mistaken in taking this to be an invitation to combine the "threshold showing" and "fair hearing" requirements where, as here, defense counsel also

4

submit expert opinions in support of the request for a hearing. Respectfully, this is completely improper and unprecedented.

The evidence presented to date was submitted by Mr. Cole to *meet his burden of making a threshold showing* that he was entitled to a fair hearing at which he could provide his evidence. It was *not intended* to take the place of that hearing. In fact, **that is exactly what occurred in the state court in *Panetti* itself, and the United States Supreme Court found that did not constitute an opportunity to make an adequate response to the state's evidence**. *Id. at 948-54*.

While *Panetti* did say that the state court below had erred in not considering defense experts, it did not say that the defense had not presented expert opinions, for they had. *Panetti* specifically noted that the defense had presented evidence that consisted of "pointed observations made by two experts the day before petitioner's scheduled execution" and "references to the extensive evidence of mental dysfunction considered in earlier legal proceedings," *id. at 950* – in other words, precisely the type of evidence that Mr. Cole has submitted. *Panetti* did not merely say that the state court should have considered these opinions too in deciding the competency issue. To the contrary, *Panetti* said that the evidence presented was sufficient *to require* a "fair hearing." *Id. at 952*. And *Panetti* did not in any way suggest that a writ proceeding in the appellate court with no briefing or oral argument constitutes a "fair hearing." In fact, to deny Mr. Panetti a hearing on this evidence, *Panetti* held, was so improper that the Supreme Court did not even need to consider whether a hearing without cross-examination or discovery would meet due process requirements, for in the absence of a hearing, no more needed to be

said. *Id.* Due process had already been violated.

Confusion about these required procedural protections seems to have been created by this Court's merging of the concepts of the threshold showing with the actual competency hearing in this Court's recent decisions in *State ex rel. Middleton v. Russell, 435 S.W.3d 83 (Mo. banc 2014),* and *State ex rel. Clayton v. Griffith, __ S.W.3d__, SC94841 (Mo. banc Mar. 14, 2015).* To the extent that *Middleton* and *Clayton* can be read to conflate these two requirements into a single determination by a non-fact-finding body such as this Court, they are incorrect.

For example, *Middleton* concluded that the petitioner failed to meet the substantial threshold showing of incompetency. *Middleton* did not, however, set out any sort of standard that must be met to satisfy that threshold requirement. Instead, *Middleton* compared Mr. Middleton's initial submissions in support of a *threshold showing* to the Supreme Court's discussion of the facts showing made by Mr. Panetti at his *merits hearing* and explained that, because Mr. Middleton's delusions were different in kind to those in *Panetti*, Mr. Middleton had not met the threshold requirement. *Middleton, 435 S.W.3d at 85-86.* The majority in *Clayton* made the same mistake and even took it a step further by concluding: "the Court finds that Clayton is competent to be executed" – despite the fact that Mr. Clayton was only attempting to meet the threshold showing for a fair hearing where his competency could be determined and despite the existence of competing expert testimony that should have called for a fair hearing at which competency could be determined. *Clayton, slip op. at 30.*

This was wrong. The evidence considered for the purposes of that *threshold*

*determination* does not provide a basis for a court to make a conclusive determination as to whether the petitioner actually is *competent*. That conclusive determination is for the separate hearing. ***And there was such a separate merits hearing in the procedural history described in* Panetti**. After the state court denied Mr. Panetti a hearing, the federal district court granted him one. *Panetti, 551 U.S. at 937-40*. At that hearing, the defense presented four experts who were subjected to cross-examination regarding Mr. Panetti's delusions. *Id. at 941-42*. The district court determined that Mr. Panetti had not shown incompetency. *Id. at 942*. The court of appeals affirmed. *Id.* The United States Supreme Court reversed the court of appeals, finding that the court of appeals and the district court used too restrictive of a test when they considered Mr. Panetti's claim of incompetence on the merits. *Panetti*'s analysis of the threshold showing described above was in response to the state court's denial of a hearing to Mr. Panetti. *Id. at 948-54*. Then *Panetti*'s description of the rational understanding test and the merits of Mr. Panetti's competency claim was in response to the evidentiary hearing that took place in federal district court and examined by the federal appellate court. *Id. at 954-62*. The Supreme Court did not blend the merits of Mr. Panetti's competency analysis into the determination of whether Mr. Panetti had made a substantial threshold showing of incompetency.

In rejecting Mr. Cole's argument that he presented a substantial threshold showing of incompetency such that he was entitled to a hearing to determine his competency, the majority, like in *Middleton* and *Clayton* before it, improperly conflates these issues and determines that Mr. Cole is competent to be executed based on the threshold showing

7

filings rather than on evidence presented at an evidentiary hearing. Indeed, the majority unintentionally exacerbates the *Middleton/Clayton* error by actually weighing the evidence offered by Mr. Cole and assessing its credibility in determining whether a threshold showing has been made.

Instead of weighing evidence and making credibility determinations, the question here is whether Mr. Cole has made a sufficient showing to trigger the need for a fair hearing. While, as the majority notes, *Panetti* did not specify exactly what test the state must apply to determine the threshold showing, by its nature the showing must be less than is required in an evidentiary hearing, for it provides merely the preliminary showing that an evidentiary hearing is required. Although courts have struggled to pin down the exact phrase properly to be used to describe this standard, courts are consistent that it is less than that required to show incompetency itself because the threshold requirement is simply the basis for holding a hearing on competency. That is, because the evidentiary hearing is a civil proceeding, it would require proof by a preponderance of the evidence. The standard sufficient for a substantial threshold showing of incapacity, therefore, must be something less.

This is the result reached in *Thompson v. Bell, 580 F.3d 423, 436 (6th Cir. 2009)*, in which the United States Court of Appeals for the Sixth Circuit held that an evidentiary hearing was warranted because the petitioner's "evidence has at least created a *genuine issue* about his competency" (emphasis added). The Sixth Circuit explained that the "genuine issue" arose from the evidence he presented in his petition, such as medical reports, a documented history of delusions and psychosis, and the state's prior efforts to

8

appoint a conservator to make medical decisions on his behalf. *Id.* The court concluded that the submitted evidence "was undoubtedly a 'substantial threshold showing,' and therefore an evidentiary hearing should have been held." *Id.*

Similarly, *Druery v. State, 412 S.W.3d 523, 539 (Tex. Crim. App. 2013)*, held that the petitioner made a substantial threshold showing of insanity and examined the interplay between the *Panetti/Ford* standard and the relevant Texas statute. There, the trial court held an "informal hearing" and made credibility determinations, as opposed to holding a formal hearing on the merits. *Id. at 526.* Under the Texas statute, a "substantial showing" required more than "some evidence" of incompetency, but less than establishing incompetency by a preponderance of the evidence. *Id. at 541.*

The court emphasized that, "[i]f resolution of the competency motion requires *resolving disputed material facts and conflicting credible evidence on the question of the defendant's incompetency*, then the defendant has 'made a substantial showing,' and additional fact-finding and a hearing are required." *Id. at 537* (emphasis added). *Druery* found that the petitioner there presented sufficient evidence such that he was entitled to a competency hearing when he alleged that, "at least some of the time," he did not believe that he committed the charged crime, meaning that he was not aware that he committed the offense for which he was convicted, and alleged that he did not think that he would be executed. *Id. at 541-42. See also Timberlake v. State, 858 N.E.2d 625, 629 (Ind. 2006)* (requiring "a reasonable possibility that [the petitioner] is insane" to meet the substantial threshold showing of insanity standard); *State v. Irick, 320 S.W.3d 284, 294 (Tenn. 2010)* (explaining that the death penalty's retributive functions are undercut "when the prisoner

9

suffers from a form of mental illness that distorts his or her mental state to the point that the prisoner's 'awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole'" (*quoting Panetti, 551 U.S. at 958-59*)).

The majority opinion seeks to distinguish *Thompson* and *Druery* on the basis that each state has its own statute. But, of course, those respective state statutes must be consistent with *Ford* and *Panetti*. These courts are either applying *Ford* and *Panetti* and not the statute or interpreting the statute in light of the statute's intent to apply *Panetti*. In fact, the United States Court of Appeals for Fifth Circuit in *Green v. Thaler, 699 F.3d 404, 417, n.10 (5th Cir. 2012)*, noted that the Texas statute at issue in *Druery* codifies the *Ford* requirement. That is no different from the majority's recognition that it must apply Missouri's statute, section 552.060.1, consistently with *Panetti*.

Moreover, although there does not seem to be a uniform standard to determine when a petitioner has made a substantial threshold showing of incompetency, neither *Ford* nor *Panetti*, nor any of the cases cited from other jurisdictions, provides any sort of authority for this Court to weigh the evidence offered by a petitioner and assess its credibility in determining whether the petitioner actually is incompetent. This Court normally does not itself act as a fact-finding body, but rather, appoints a master even in a habeas proceeding. Indeed, in this case this Court does not even have the benefit of briefing or of oral argument. It is deciding factual and credibility issues solely on the basis of Mr. Cole's writ petition, suggestions in support, and supporting exhibits submitted on March 23, the State's suggestions in opposition and supporting exhibits

10

submitted on March 27, and Mr. Cole's reply and supporting exhibits submitted on March 30.

While cross-examination and discovery might not always be necessary, a right to respond at a hearing to the State's evidence concededly is. A writ proceeding in an appellate court with no briefing or oral argument does not constitute a "fair hearing."

And where, as here, the question is the meaning of and basis for an expert's testimony and his qualifications, then discovery and cross-examination also are necessary. For instance, the majority opinion argues that forensic psychiatrist Dr. William Logan is not credible because his 2002 testimony was based on evidence presented only by the defense and an examination of Mr. Cole. The majority discounts Dr. Logan's more recent report, despite the fact that it considers the evidence offered by both sides, and considers an examination of Mr. Cole in February 2015, because while the majority finds that he does not adequately understand the rationale for his execution, it does not state what he does understand. Of course, that is a matter that should be explored at an evidentiary hearing, but the request for that hearing is denied.

The majority similarly says that it believes that Mr. Cole's rational discussion of his execution in certain telephone conversations shows that he is competent. But whether the ability to sometimes sound rational means one understands the nature and purpose of one's execution is a matter that comes within the province of expert testimony – testimony that the State could present at a hearing, but that this Court does not have the psychiatric skill to assess in the absence of such a hearing.

The majority concludes that Dr. Logan is not credible because he also testified for

11

the defense in *Middleton* and *Clayton.* Finding experts willing to get involved in death penalty litigation is exceedingly difficult, and it will be all the more so if experts must be "one and done" – if they can testify only in a single case before being discounted as just a defense shill. This is particularly true here where defense counsel indicate that Dr. Logan, in fact, testifies for both the prosecution and the defense – but if this is in question, then it could be explored in cross-examination at the hearing that the majority refuses to permit.

The majority recognizes that a person can be delusional and incompetent to be executed, but says that because Mr. Cole was not incompetent and did not show mental illness prior to the last few years, it is not credible that he suddenly became incompetent. That may be so, but it may not be so. That is a matter for expert testimony – testimony that could be presented at the hearing that will not be held.

These are precisely the reasons that a fair hearing is required, so that the preliminary record used to support a threshold showing is not the sole basis of the competency determination, but rather, the parties can flesh out and support their views, demonstrate weaknesses in the views of the other side, and come to an understanding of the ultimate issue – whether the petitioner is competent.

Mr. Cole has presented sufficient evidence to make a threshold showing of incompetence. Dr. Logan has provided two reports, dated March 12, 2015, and March 28, 2015, that find that Mr. Cole is "depressed with prominent symptoms of psychosis" and that he "lack[s] the capacity to understand the nature and purpose of the punishment about to be imposed upon him." Dr. Logan reached this determination based on a recent

12

2.5 hour in-person examination, a 2002 mental health evaluation of Mr. Cole, information provided by Mr. Cole's attorneys, and taking into consideration exhibits filed by the State including offender grievance forms, prison mental health records, and transcripts of telephone calls made by Mr. Cole. The State contends that Dr. Logan's findings are not credible because the post-conviction motion court was not persuaded by his 2002 testimony on grounds that it was informed only by information from Mr. Cole's attorneys. The State's suggestion that his present evaluation is similarly biased is flatly refuted by Dr. Logan's March 28 report, in which he makes clear that he has considered the State's evidence in reaching his conclusions, as well as the additional evidence provided by his February 20, 2015, in person examination of Mr. Cole. Further, Dr. Logan has testified as an expert on the side of the prosecution as well as the defense, rather than being solely a defense expert.

During his February 20, 2015, examination, Mr. Cole reported to Dr. Logan that, in addition to experiencing feelings of depression, he is disturbed by "voices of individuals unfamiliar to him," which are alternately threatening or helpful, which sometimes speak to him through the television and intercom, and which prevent him from sleeping. Mr. Cole's current and former attorneys attest that his mental health has deteriorated significantly over the course of their representation. More recently, they have observed increasingly agitated and paranoid behavior from their client, and he has reported hearing voices to them as well. Attorney Carol Camp attests that during a February 7, 2015, meeting at which she attempted to update Mr. Cole about his case, "it became apparent that he did not grasp the significance of those developments or how they

13

might affect his case. Andre went on at length about the voices he hears and his resulting troubles sleeping at night."

Contrary to the State's assertion that Mr. Cole only reported the voices after a show cause order was issued in his case, his former counsel, Jessica Sutton, described the following behavior at their October 4, 2014, meeting, several weeks prior to the issuance of the show cause order: "Mr. Cole was in a highly agitated state during the meeting … [he] discussed the whispers that he was hearing. Mr. Cole's speech was at times unintelligible, in that he was mumbling in a quiet whisper to prevent 'them' from hearing us, despite the fact that we were in an unsupervised attorney visit." Ms. Sutton's colleague, Rebecca Woodman, attests that Ms. Sutton told her on October 4 "about Andre hearing voices during her visit with him."

Dr. Logan reports that the State's other evidence of "malingering" – the fact that Mr. Cole filed grievances, reported no issues to prison mental health providers, and carried on several brief telephone conversations – is not inconsistent with his finding of psychosis, is not supported by expert testimony, and is not scientific in nature.

The grievances filed by Mr. Cole in 2007 and 2008 do not provide evidence as to his *current* mental health condition, the only relevant inquiry in a *Ford/Panetti* claim. The more recent grievances concerning the State's changing execution protocol were drafted by his attorneys.

Likewise, prison mental health records from 2001 are irrelevant to a determination of Mr. Cole's current mental health. The State's reliance on a Dr. Whitehead's March 24, 2015, observation that Mr. Cole denied hearing voices is, Dr. Logan asserts,

14

misplaced given that the wellness check lasted only a matter of minutes, took place through the cell door, and was not conducted by a person of trust, and that acknowledging the voices would have invited unwanted treatment.

Certainly, the State also presented strong contrary evidence, detailed by the majority opinion. And, were a fair hearing held, both the defense and the State might well present additional evidence that would support their respective positions, evidence as to which this Court can only guess at this point. My point is *not* that I believe Mr. Cole's evidence over that of the State, but that this is *not* a determination that I or my colleagues should make in the absence of a reference of this issue to a master for an evidentiary hearing. Whether the fact-finder at a fair hearing would find for one party or the other I do not presume to know. Neither should the majority. I would hold only that a threshold showing has been made and that this Court should refer this matter to a master for a fair hearing at which evidence may be presented.

_____
**LAURA DENVIR STITH, JUDGE**

15